# Walker *v.* Griffith.

*Statutory Action of Detinue for Horses.*

1. *Local law; preliminary notice; recitals of legislative journals.*—Although the constitution, by the 24th section of the 4th article, requires that notice shall be given of the intention to apply for the passage of a local law, it does not require that the journals shall affirmatively show that such notice was proved to have been given; consequently, when the journals are silent, the courts will presume, in favor of the validity of a local law, when signed by the presiding officer of each house, and approved by the governor, that proof was made of the preliminary notice.

2. *Legislative rules of proceeding in passage of bills; recitals of legislative journals.*—Although the constitution, by the 21st section of the 4th article, requires that bills shall be read three times in each house on different days, it does not require that the journals of the two houses shall affirmatively show that this was done; nor is it necessary to the validity of a law that the journals should show the fact.

3. *"Act to change boundary line between counties of Blount, Walker, and Jefferson, and authorize removal of county-seat of Blount;" constitutionality of, as to title and subject-matter.*—The act approved February 8, 1877, entitled "An act to change the boundary line between the counties of Blount, Walker, and Jefferson, and to authorize the 'removal of the county-seat of Blount county," (Sess. Acts 1876-7, pp. 229-31), is not violative of the constitutional provision

[Walker v. Griffith.]

contained in the 2d section of the 4th article, which declares, "Each law shall contain but one subject, which shall be clearly expressed in its title."

APPEAL from the Circuit Court of Blount.

Tried before the Hon. LOUIS WYETH.

This action was brought by Artelissa Walker, against Asa Griffith, to recover two horses, together with damages for their detention; and was commenced on the 26th February, 1877. The defendant pleaded, in abatement, that he was a resident citizen of Walker county at the commencement of the suit; and issue was joined on this plea. On the trial, as the bill of exceptions states, the defendant proved, in support of his plea, "that he was a resident citizen of the State of Alabama at the commencement of the suit, and was a householder and a freeholder, residing in that part of Walker county which was cut off from said county of Walker, and added to said county of Blount, by the act of the legislature of Alabama, approved February 8, 1877, entitled 'An act to change the boundary line of the counties of Blount, Walker, and Jefferson, and to authorize the removal of the county-seat of Blount county.'" This being "substantially all the evidence," the court charged the jury, that said act was unconstitutional and void, because it contained more than one subject, and that they must find for the defendant, if they believed the evidence. This charge, to which the plaintiff excepted, is now assigned as error.

The said act of the legislature, which may be found in the Session Acts 1876-7, pp. 229-31, is in the following words:

"An act to change the boundary line between the counties of Blount, Walker, and Jefferson, and to authorize the removal of the county-seat of Blount county.

"SECTION 1. *Be it enacted by the General Assembly of Alabama,* That the county line between Blount, Walker, and Jefferson counties shall commence at a point where Blount, Cullman and Walker counties meet or corner, and shall run thence due west to range line number (5) five, west; thence due south, along said line, to the Jefferson county line; thence along said line dividing Jefferson and Walker counties, in a northeasterly direction, to the southeast corner of sextion six, township fourteen, range three, west; thence due east, to the line now dividing the counties of Blount and Jefferson; thence, with the present boundary line between Blount, Jefferson, St. Clair, Etowah and Cullman counties, to the point of beginning.

"SEC. 2. *Be it further enacted,* That William G. Byars, William Drennen, William Warren, William M. Crump, and W.F. Dickinson be, and the same are hereby, appointed a

board of commissioners, for the performance of the duties and exercise of the powers hereinafter enjoined and conferred upon them, a majority of whom may act in the premises.

"SEC. 3. *Be it further enacted*, That said board of commissioners are hereby empowered and directed to divide said county into election precincts to the best convenience of the people, and to designate the place of voting therein as soon as practicable, and to give notice of boundaries of said precincts and places of voting therein, by publication in some newspaper published in said county, for at least twenty days previous to the election hereinafter provided for. The said board shall hold an election on the second Monday of April, 1877, in said county, by giving at least thirty days' notice thereof, by advertising in some newspaper published in said county, for the selection of a permanent county-seat, that Blount Springs and Blountsville may be voted for as said county-seats by the qualified electors therein; those voting for Blount Springs to put in a ballot upon which the words '*Blount Springs*' shall be written or printed, and those voting for Blountsville shall put in a ballot upon which [Blountsville] shall be written or printed; that said commissioners are empowered to appoint three inspectors and one returning officer for each election precinct in said county to hold said election, who shall be governed in their duties by the laws regulating elections in this State; that said returning officers shall make their return to said commissioners, at Blountsville, Alabama, within forty-eight hours after said election; that said commissioners, after duly counting the votes, shall make certified returns thereof to the governor of Alabama, within five days from the day of election; that within ten days thereafter, the governor, secretary of State and auditor shall count the votes, and the governor shall by proclamation declare the place that is selected as the county-seat by the majority of the votes cast at said election.

"SEC. 4. *Be it further enacted*, That the citizens of the said counties of Walker and Jefferson, which shall, by the provisions of this act, be attached to the county of Blount, be and the same are hereby required to assume and pay their *pro-rata* share of the existing indebtedness of Walker and Jefferson counties, portions of which are attached to Blount county by this bill; which shall be ascertained and paid as provided by section 29 of the Revised Code.

"SEC. 5. *Be it further enacted*, That the present officers of Blount county shall hold their offices until the expiration of the time for which they were elected or appointed, subject, however, to the conditions now imposed on them by law."

THOS. H. WATTS, with TERRY & LANE, for appellant.

Neither the record nor the docket shows the names of the counsel, if any, who appeared for the appellee; and there are no briefs on file.

MANNING, J.—The question presented for our determination in this cause is, whether or not the "*act to change the boundary line between the counties of Blount, Walker, and Jefferson, and to authorize the removal of the county-seat of Blount county,*" approved February 8, 1877, is a valid enactment. It is supposed to be obnoxious to, or that it was not passed in accordance with, several provisions of the constitution.

Doubtless, the sections of that instrument which prescribe rules concerning the introduction and progress of bills through the two houses of the general assembly, and the conduct of their business, are mandatory upon the members of those bodies. The obligation to observe them, arising from their accepting the position of legislators, is confirmed by the official oath they take—the same oath by which judges are bound to a faithful and conscientious discharge of their duties.

There is a wide difference, however, between the functions and modes of proceedings of the legislative, and those of the judicial department of the government; and out of this difference arises a political necessity, recognized in the constitution itself, that each shall, in its action, be almost wholly independent of the other. Except in the few instances in which the duty is expressly imposed by the constitution, or required by the plain meaning of its provisions, and in those cases, perhaps, in which the journals of the senate and house of representatives affirmatively and conclusively show that the rules of proceeding prescribed to them by the constitution have not been observed, it would generally be practically as inconvenient and difficult, as it would be unseemly, for the judiciary to undertake to regulate, or critically to scrutinize, the manner or degree in which the legislature conforms to, or disregards, the requirements of parliamentary law in the transaction of its business.

However formally and unexceptionably a statute may have been passed by the general assembly, yet, whether its provisions do not contravene the constitution of the State, or of the United States, or treaties made by the latter,—to which all the departments of the State government must yield obedience,—and whether the courts are not forbidden by this superior law from enforcing such enactment, and re-

quired to pronounce it void, are questions which, when properly presented, they must, from the very nature of our American institutions, consider and determine. This is one of the most effective and least offensive of the means which have been devised, for securing the liberties and privileges that the people have reserved, in their constitutions of government, from legislative encroachment. One of its unavoidable effects, however, is a vast amount of litigation concerning constitutional questions, and a consequent uncertainty in our statute law; evils by which the people and courts of England, under their "omnipotent" parliament, are never vexed. But it would greatly increase these inconveniences, without securing corresponding benefits, if, when acts purporting to be those of the legislature are produced, after having been engrossed and enrolled under the supervision of the proper committees of the two houses, and authenticated by the signatures of the speaker of one and the president of the other, and then approved and signed by the governor, and filed in the office of the secretary of State, the courts must still, except in the instances before mentioned, determine whether they had been passed in minute compliance with all the rules of proceeding prescribed by the constitution for conducting bills through the process of enactment into laws. In such inquiries, the journals would, of course, have to be resorted to ; and when the constitution requires that a particular thing shall be necessary to the validity of an act of legislation, and that the journal must show that this thing was done,—as, for instance, the passage of a bill by yeas and nays which shall be entered on the journals,—unless they do show it, the act can not be accepted as constitutionally adopted. The thing thus required is an additional means, outside of the enrolled act, but in concurrence with the signatures of the speaker of the house of representatives and president of the senate upon it, authenticating its passage through the two houses, and renders the forgery of such an act more difficult. And as the passage of it by the yeas and nays can not, according to the constitution, be shown otherwise than by the journals, they must, in respect to it, "import absolute verity." The existence or non-existence of the statute depends on their testimony, whether they speak or are silent.

But, except in such cases, their mere silence does not invalidate. The principal objects, in requiring the journals to be kept, probably were : first, that the members might be thereby informed, from day to day, of the progress and state of the business before them ; and, secondly, that constituencies might afterwards see how their representatives had per-

formed their duties in the public councils.  But, certainly, the journals are, in many respects, too defectively kept, to be much relied on as evidence in the courts ; for the reason that they rarely set forth correctly all of the proceedings, how- ever faithful the officer who writes them up may be.

Discussing provisions in the constitution of New Jersey, similar to those in our constitution, the Supreme Court of that State, in a very able opinion by Chief-Justice Beasley, said : " Its language is, ' Each house shall keep a journal of its proceedings, and from time to time publish the same ; and the yeas and nays of the members of either house, on any question, shall, at the desire of one-fifth of those pres- ent, be entered on the journal.'  And by the last clause of paragraph sixth, it is further directed,  ·  ·  · 'that the yeas and nays of the members voting on such final passage shall be entered on the journal.'  These are all the constitu- tional requirements relating to these diaries ; and it will be observed that, with the exception of recording the yeas and nays, there is no prescription in the constitution of what they shall contain.  They are not required to be attested in any way whatever ; nor is it said that they shall even be read over to the houses, so that their correctness may stand approved.  ·  ·  ·  · In the nature of things, they must be constructed out of loose and hasty *memoranda*, made in the pressure of business, and amid the distractions of a numerous assembly.  ·  ·  · Can any one deny that, if the laws of the State are to be tested · by a comparison with these journals, so imperfect, so unauthenticated, that 'the, stability of all written law will be shaken to its foundation ?"

Serious, indeed, would be the consequences, no less in ref- erence to past legislative acts, under which the affairs of com- munities and of individuals may have been long adminis- tered, than in reference to future enactments, if they must be tried, to the extent contended for, by such fallible and fal- lacious tests.  It would almost be impossible to know which of the acts, published from time to time in the statute-books as laws, were laws in fact.  Whenever a case should arise under any of them, the printed journals of the two houses would be poured over and scrutinized, to ascertain when and how the bills in which they had their origin were introduced, and what motions had been made, readings had, references ordered, amendments proposed, and votes taken, in respect to them, for the purpose, by these examinations, of finding out objections, to be raised in the courts, to the validity of such acts.  The journals would become as important to the ascertainment of what the law is, as the statute-books them- selves ; and few persons could be sure that they were not

[Walker v. Griffith.]

violating the law, in their endeavors loyally to obey it. Instead of being enlightened concerning their rights and duties, the people would find increased uncertainty; and legislation would become, more than ever, a source of continual and oppressive litigation. We, therefore, unhesitatingly agree in the opinion of Judge Cooley, that it should "not be presumed, in any case, from the mere silence of the journals, that either house has exceeded its authority, or disregarded a constitutional requirement in the passage of legislative acts, unless. where the constitution has expressly required the journals to show the action taken; as, for instance, where it requires the yeas and nays to be entered."—Const. Lim. 135-6.

We refrain from going into any more detail in respect to our conclusions, because there are cases before us, in which the question may be considered in other aspects. Of course, though, we do not hold that judges are prevented from examining the journals, or seeking evidence elsewhere, to satisfy themselves, as it is their duty to do, of the existence of a law, or of the time when it was enacted, when a well-founded doubt of either may exist. Such investigations are within the province of the courts; and upon this subject, there have been delivered several learned and well-considered opinions.— *Gardner v. Collector*, 6 Wallace, 499; *The People v. Devlin*, 33 N. Y. 278, *et seq.* But the courts are not at liberty to treat as void acts which are authenticated, in the long-used and proper manner, as statutes of the general assembly, because the journals do not show that they were passed in accordance with all the rules of parliamentary law prescribed in the constitution for the conduct of legislative business.

Accordingly, this court has heretofore held, since the constitution does not expressly require the journals to show that the notice prescribed by section 24 of article IV, of an intention to apply for the passage of a local or special act, was in fact given, that we will presume, when the journals are silent, that the legislature did not pass such a bill without sufficient proof on that subject.—*Harrison v. Goudy*, at the last term. The assignment of error based on that section is, therefore, not sustained.

For the same reasons, we decline to pronounce the act under consideration void, because it does not appear by the journals (if, indeed, it does not) that the bill in which it had its origin had received three readings in each house. If the journals do not show that it had been read three times, it is to be presumed that the members knew that this had been done, from their own participation in the proceedings, or from memoranda on the bill, when they voted for its passage.

The other objection, relating to the unity of the subject of the act, is to be determined, not by reference to the journals, but by a consideration of the act itself, and of the title to it. Section 2 of article IV of the constitution ordains, that "each law shall contain but one subject, which shall be clearly expressed in its title;" and this clause is supposed to be infringed by the act in question. It is insisted that the title of the act sets forth, and the body of it contains, two distinct subjects; one to change boundary lines between three contiguous counties, and the other to change the site of the court-house of one of them. In looking into the act, we see that the change made in the boundary lines mentioned, has the effect of enlarging Blount county, by annexing to it some of the territory that formerly belonged to the counties of Walker and Jefferson, respectively; and a consequence of this, doubtless, was to put the present court-house at a distance from the centre of Blount county; wherefore, provision was made for selecting for it another location. The real operation of the act is to *reconstitute Blount county ;* and this it does, by adding to it the territory referred to, and by providing for the selection of another county-seat.

Suppose the title were simply, "*An act to reconstitute Blount county;*" under this title, it would be allowable to change the boundary upon any side of Blount county, or entirely around it, and to change the county-seat. All of this would be entirely germane to the subject expressed in that title; and whatever is germane to, and congruous with the subject of a statute, may be embodied as a part of it in the same act, without destroying the unity of the subject.—*Board of Revenue v. Barber,* 53 Ala. 589; *Ex parte Hickey,* 52 Ala. 229. The subject of a statute may be a large one, having several branches, and requiring much detail; as an *act to raise revenue,* for instance. And it would protract the work of legislation enormously, and make it almost impossible of performance, if the constitutional provision in question were so construed, as to require a separate statute for the enactment of each detail. There can be no doubt, that the general title above suggested for the act under discussion would authorize the introduction into the act of all the provisions it now contains, and more.—See *People v. Mahony,* 13 Mich. 500; *Blood v. Mercelliott,* 53 Penn. St. 391; Cooley's Con. Lim. 145, *et seq.; Harris v. People,* 59 N. Y. 599. And it thence follows that this act does not contain more than one subject.

Is this subject clearly expressed in the title? Certainly, what the statute enacts is defined with more precision, than it would be under the more comprehensive title expressive of a single subject, above set forth as sufficient. For this

would afford a larger scope for details, relating to the same subject, than is allowed by the title really adopted. The fault of this title is, that, while it is very restricted, and leaves but little margin for an expansion of the subject of the act, it seems, by its particularity in specifying details, to indicate two subjects in the act. But this is a misconception, as a mere transposition of the clauses composing the title will tend to show. Let it be read as follows: *"An act to remove the county-seat of Blount county, and to change the boundary line between the counties of Blount, Walker, and Jefferson."* This makes it more evident that the subject of the act is the reconstruction or reconstitution of Blount county, to the limited extent explained by the title. But this is made apparent, not by changing the meaning of the title, but the order of the two clauses composing it.

The object of the constitutional provision is two-fold: first, truly to inform members, who are to vote upon the bill, what the subject of it is, so that they may not perform that duty, deceived or ignorant of what they are doing; and, secondly, to prevent the mischievous legislative practice known as "log-rolling;" that is, of embracing in one bill several distinct matters, none of which, perhaps, could singly obtain the assent of the legislature, and then procuring its passage by a combination of the minorities in favor of each of the measures, into a majority that will adopt them all. No object of the constitutional provision referred to is defeated or impugned by the title of this act, or by the act itself; and we cannot hold that the constitution makes the statute void.

Let the judgment be reversed, and the cause be remanded.