(75 South. 988)

JONES et al. v. McDADE.    (3 Div. 296.)

(Supreme Court of Alabama.    May 17, 1917. Rehearing Denied June 21, 1917.)

1. CONSTITUTIONAL LAW 70(1)—JUDICIAL FUNCTIONS—AMENDMENT OF CONSTITUTION —VALIDITY.

The inquiry whether the organic law has been validly and effectually amended is a judicial question.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129, 132, 137.]

2. CONSTITUTIONAL LAW 7—AMENDMENT OF CONSTITUTION—PROCEDURE—REQUISITES.

Under Const. §§ 284–287, inclusive, as to amendment of Constitution by legislative proposal, it is not essential that the House Journals affirmatively show that the required three readings of the proposed amendments were made.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 3, 4.]

3. CONSTITUTIONAL LAW 7 — AMENDMENT OF CONSTITUTION—PROCEDURE—REQUISITES.

Under Const. § 284, the requirement of three readings in each house of proposed amendment to the Constitution does not exact six readings of the proposed amendment in hæc verba in both houses.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 3, 4.]

4. CONSTITUTIONAL LAW 7—AMENDMENT OF CONSTITUTION—PROCEDURE—REQUISITES.

The mere fact that under Const. § 287, as to constitutional amendments, such proposals may be submitted through bills or acts of the

Legislature, does not impose upon the amendments of the Constitution the restrictions with respect to the amendment of bills contained in Const. §§ 61, 64.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 3, 4.]

5. CONSTITUTIONAL LAW ⚍20 — CONSTRUCTION OF CONSTITUTION—LEGISLATIVE INTERPRETATION.

The general and long-accepted interpretation of the legislative bodies of a constitutional provision is available for correctly interpreting the organic law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 14, 15.]

6. CONSTITUTIONAL LAW ⚍9(1) — AMENDMENT OF CONSTITUTION—BALLOTS—REQUISITES.

Requirements of Const. § 285, that a ballot on a constitutional amendment contain the substance or subject-matter of the proposed amendment so printed that the nature thereof shall be clearly indicated does not demand that the contents of the ballot inform the voters of the entire contents of the amendment of which they are presumed to have had due notice through advertisements.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 5, 7.]

7. CONSTITUTIONAL LAW ⚍9(1) — AMENDMENT OF CONSTITUTION — BALLOTS — "NATURE."

The word "nature" in such section means kind, species, character, or sort.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 5, 7.

For other definitions, see Words and Phrases, First and Second Series, Nature.]

8. CONSTITUTIONAL LAW ⚍7 — AMENDMENT OF CONSTITUTION—REQUISITES—"SUBSTITUTION."

A proposed constitutional amendment, the first draft of which was withdrawn and substitute passed, the draft and the substitute having been read the required number of times, was validly passed; substitution being in fact a form of amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 3, 4.

For other definitions, see Words and Phrases, First and Second Series, Substitution.]

9. CONSTITUTIONAL LAW ⚍7 — AMENDMENT OF CONSTITUTION—PRESUMPTIONS.

Since Const. § 284, as to proposed amendments, does not require the journals to show affirmatively that the readings were given the bill, it would be presumed in the absence of recital that the necessary readings were given.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 3, 4.]

10. CONSTITUTIONAL LAW ⚍9(1) — AMENDMENT OF CONSTITUTION—BALLOTS.

Whether a ballot on a proposed constitutional amendment is valid is determined by compliance with Const. § 285, and not with the directions of the act proposing the amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 5, 7.]

11. CONSTITUTIONAL LAW ⚍9(1) — AMENDMENT OF CONSTITUTION — PROCEEDINGS — BALLOTS.

Where a constitutional amendment was proposed to put the judge of probate, the sheriff, the tax collector, and tax assessor of Montgomery county on certain salaries, and to make certain allowances with respect thereto, and to require the fees incident to these offices to be covered into the county treasury, and to authorize the Legislature by general or local law to thereafter from time to time fix, regulate, and alter the amount of the salaries and allowances named in the amendment, including the method and basis of their compensation, and to fix, regulate, and alter the amount of compensation received by all other county officers of Montgomery county, its submission on a ballot in the words, "Shall the Constitution of Alabama be amended so that the judge of probate, sheriff, tax assessor and tax collector of Montgomery county will be placed on salary and required to cover the fees collected by them into the treasury of Montgomery county?" was sufficient, although no reference was made to the alteration of salaries.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 5, 7.]

12. CONSTITUTIONAL LAW ⚍9(1) — AMENDMENT—PRESUMPTION.

It is to be conclusively presumed that every voter received the benefit of the notice through the publication in extenso of a proposed constitutional amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 5, 7.]

Appeal from Circuit Court, Montgomery County; Gaston Gunter, Judge.

Bill by W. R. McDade against R. H. Jones and others, as the Board of Revenue of Montgomery County. From a decree for complainant, defendants appeal. Reversed, and bill dismissed, and judgment rendered.

The acts and the proposal referred to in the opinion are as follows:

An act to submit to the qualified voters of the state of Alabama at the general election to be held on the first Tuesday after the first Monday of November, 1916, for their consideration, an amendment to the Constitution of the state, fixing the salaries and compensations and allowances to be paid to the judge of probate, sheriff, the tax assessor and the tax collector of Montgomery county requiring the said officers to cover the fees collected by them into the county treasury of Montgomery county and authorizing and empowering the Legislature thereafter to fix and regulate and alter the costs, charges, and fees and salaries of such officers including the method and basis of their compensation.

Be it enacted by the Legislature of Alabama: Section 1. That the following amendment to the Constitution of Alabama is hereby proposed to be submitted to the qualified voters of Alabama for their consideration as hereinafter set forth, viz.: commencing at the beginning of their next term of office, subsequent to the general election to be held on the first Tuesday after the first Monday of November, 1916, the compensation and allowance of the following named county officers of Montgomery county shall be as follows: Salary of judge of probate of Montgomery county $5,000.00 per year net; allowance of $5,500.00 per annum for office expenses as follows: One clerk at $1,500.00 per annum; two clerks at $1,000.00 per annum each; one clerk at $800.00 per annum, and $1,200.00 per annum for all other expenses, including extra clerks. The said $1,200 to be paid to the judge of probate in monthly installments and disbursed by him. The tax collector of Montgomery county shall receive a salary of $4,000.00 per year net; allowance of $1,500.00 per year for his clerk in said office and $1,000.00 for extra help. The tax assessor of Montgomery county shall receive a salary of $4,000.00 per year net; allowance of $1,500.00 per year for a chief clerk in said office; $900.00 for an

⚍For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

assistant clerk in said office and $600.00 per year for extra help. The sheriff of Montgomery county shall receive a salary of $4,000.00 per year net; allowance of $1,200.00 per year for a chief clerk·in said office; $1,380.00 per year for a chief deputy; $2,200.00 per year for two deputies in said office, and $1,000.00 for extra assistance. These amounts to be paid out of the county treasury of Montgomery county. This shall not interfere with the amounts now or hereafter allowed the sheriff for guards at the county jail or bailiffs for courts, nor with the provisions for feeding prisoners. The sheriff shall receive amounts now provided by law, and shall cover the same into the county treasury of Montgomery county, and the board of revenue of Montgomery county shall pay out of the county treasury of Montgomery county the expenses incurred by the sheriff in feeding said prisoners. The above-named amounts shall be in lieu of all compensations and allowances to the respective named officers. These amounts shall be paid out of the county treasury of Montgomery county as the salaries of other county officers are paid. The above-named officers shall collect the fees heretofore collected by them and shall cover such fees into the county treasury on the first Monday of each month. The board of revenue of Montgomery county shall provide said officers with necessary quarters, books, stationery and other conveniences. The Legislature of Alabama may hereafter from time to time by local or general laws, fix, regulate and alter the amount of the above-named salaries and allowances, including the method and basis of their compensation, also fix, regulate and alter amount of compensation received by all other county officers of said county.

Sec. 2. That it shall be the duty of the Governor to give notice by proclamation to be published in one newspaper in each county in the state, at least eight consecutive weeks, next preceding the general election in November, 1916, of the election on the amendment proposed by this act, to be submitted to the qualified voters of the state, for their consideration, together with the proposed amendment.

Sec. 3. That at the general election in November, 1916, an election shall be held for the vote of the qualified electors of the state upon the proposed amendment. Upon the ballots used at such election shall be printed the following: "Amendment to the Constitution, fixing the compensations and allowances of the following named county officers of Montgomery county, commencing at the beginning of their next term of office, subsequent to the general election in November, 1916, as follows: Salary of judge of probate of Montgomery county $5,000.00 per year net; allowance of $5,500.00 per annum for office expenses as follows: one clerk at $1,-500.00 per annum; two clerks at $1,000.00 per annum each; one clerk at $800.00 per annum, and $1,200.00 per annum for all other expenses including extra clerks. The said $1,200.00 to be paid to the judge of probate in monthly installments and disbursed by him. Tax collector of Montgomery county, salary of $4,000.00 per year net; allowance of $1,500.00 per year for a clerk, and $1,000.00 per year for extra help. Tax assessor of Montgomery county, salary of $4,000.00 per year net; allowance of $1,500.00 for a chief clerk and $900.00 per year for assistant clerk and $600.00 per year for extra help. Sheriff of Montgomery county, salary of $4,000.00 per year net; allowance of $1,200.00 per year for chief clerk; $1,380.00 per year for chief deputy, $2,000.00 per year for two deputies, and $1,000.00 per year for extra assistance. These amounts shall be paid out of the county treasury of Montgomery county as the salaries of other county officers are paid. The above-named officers shall collect the fees heretofore collected by them, and shall cover such fees into the county treasury on the first Monday of

each month. The above-named amounts shall be in lieu of all compensation and allowances to the respectively named officers, except that this shall not interfere with the allowances for the guards at the county jail, bailiffs to attend the court of the county, nor with the provisions for feeding the prisoners at the county jail, provided, that as to feeding prisoners, the sheriff shall receive the amounts now provided by law, and cover same into the county treasury of Montgomery county, and the board of revenue of Montgomery county shall pay out of the county treasury of Montgomery county the expenses incurred by the sheriff in feeding such prisoners. The board of revenue of Montgomery county shall provide said officers with the necessary conveniences. The Legislature of Alabama may hereafter from time to time, by local or general laws, fix, regulate and alter the amount of the above-named allowances and salaries including the method and basis of their compensation." Following the proposed amendment on the ballot shall be printed the word "Yes," and immediately under that shall be printed the word "No." The choice of the elector shall be indicated by the cross-mark by him opposite the word expressing his desire.

Sec. 4. The officers of such general election shall open a poll for the vote of the qualified electors upon the proposed amendment. The election shall be held in all things in accordance with the law governing general elections. In the election upon such proposed amendment, the votes cast thereat shall be canvassed, tabulated, and the returns thereof made to the secretary of state, and counted in the same manner as in elections for representatives to the Legislature, and if it shall thereupon appear that a majority of the qualified electors who voted upon the proposed amendment voted in favor of the same, such amendment shall be valid to all intents and purposes as a part of the Constitution of Alabama. The result of such election shall be made known by proclamation of the Governor.

### Article XVIII. Mode of Amending the Constitution.

Sec. 284. Amendments may be proposed to this Constitution by the Legislature in the manner following: The proposed amendments shall be read in the house in which they originate on three several days, and, if upon the third reading three-fifths of all the members shall vote in favor thereof, the proposed amendments shall be sent to the other house, in which they shall likewise be read on three several days, and if upon the third reading three-fifths of all the members elected to that house shall vote in favor of the proposed amendments, the Legislature shall order an election by the qualified electors of the state upon such proposed amendments, to be held either at the general election next succeeding the session of the Legislature at which the amendments are proposed or upon another day appointed by the Legislature, not less than three months after the final adjournment of the session of the Legislature at which the amendments were proposed. Notice of such election, together with the proposed amendments, shall be given by proclamation of the Governor, which shall be published in every county in such manner as the Legislature shall direct, for at least eight successive weeks next preceding the day appointed for such election. On the day so appointed an election shall be held for the vote of the qualified electors of the state upon the proposed amendments. If such election be held on the day of the general election, the officers of such general election shall open a poll for the vote of the qualified electors upon the proposed amendments; if it be held on a day other than that of a general election, officers for such election shall be appointed; and the election shall be held in all things in accordance with

the law governing general elections. In all elections upon such proposed amendments the votes cast thereat shall be canvassed, tabulated, and returns thereof be made to the secretary of state, and counted, in the same manner as in elections for representatives to the Legislature; and if it shall thereupon appear that a majority of the qualified electors who voted at such election upon the proposed amendments voted in favor of the same, such amendments shall be valid to all intents and purposes as parts of this Constitution. The result of such election shall be made known by proclamation of the Governor. Representation in the Legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments.

Sec. 286. No convention shall hereafter be held for the purpose of altering or amending the Constitution of this state, unless after the Legislature by a vote of a majority of all the members elected to each house has passed an act or resolution calling a convention for such purpose, the question of convention or no convention shall be first submitted to a vote of all the qualified electors of the state, and approved by a majority of those voting at such election. No act or resolution of the Legislature calling a convention for the purpose of altering or amending the Constitution of this state, shall be repealed except upon the vote of a majority of all the members elected to each house at the same session at which such act or resolution was passed: Provided, nothing herein contained shall be construed as restricting the jurisdiction and power of the convention, when duly assembled in pursuance of this section, to establish such ordinances and to do and perform such things as to the convention may seem necessary or proper for the purpose of altering, revising, or amending the existing Constitution.

Sec. 287. All votes of the Legislature upon proposed amendments to this Constitution, and upon bills or resolutions calling a convention for the purpose of altering or amending the Constitution of this state, shall be taken by yeas and nays and entered on the journals. No act or resolution of the Legislature passed in accordance with the provisions of this article, proposing amendments to this Constitution, or calling a convention for the purpose of altering or amending the Constitution of this state, shall be submitted for the approval of the Governor, but shall be valid without his approval.

A. H. Arrington and Hill, Hill, Whiting & Stern, all of Montgomery, for appellants. W. A. Gunter, of Montgomery, for appellee.

McCLELLAN, J. Article 18, consisting of sections 284–287, inclusive, provides a complete system for either amending the organic law through the submission by the Legislature of an amendment or amendments to the electorate of the state, or the submission by the Legislature to the electorate of a proposition to constitute and convene a body to alter the Constitution. The report of this appeal will contain the sections mentioned, except 285, which is quoted in the opinion. The process provided by these sections is not legislation, is not lawmaking in the sense that laws are proposed and are considered and enacted, under the Constitution of this state. One of the distinguishing features of the two systems and processes is that to the executive is committed functions and powers with respect to the enactment of statutes (Const. §§ 45, 61, 62, 63, 64, and 125); while with respect to the submission to the electorate of propositions for the amendment of the organic law or for the convention of a body to alter or amend the Constitution through "act or resolution" section 287 provides that neither the "act or resolution" so evincing the judgment of the Senate and House in the premises "shall be submitted for the approval of the Governor, but shall be valid without his approval." Another distinguishing feature is present in the fact that a statute becomes a law when its enactment has been accomplished according to the forms prescribed by the Constitution; whereas the service performed by the legislative houses in respect of changes in the Constitution is that of a proposer of a proposition for the consideration and judgment of the electors at the ballot box; and such a proposition is wholly ineffectual unless the requisite majority of the electorate affirmatively approve the proposition so submitted. The proposal and submission of an amendment or of amendments to the Constitution may be made by resolution, instead of by an act; the choice of one of these means by the houses for submitting an amendment to the judgment of the electorate being given the houses by section 287 of the Constitution. A comparison of the methods prescribed by the Constitution for enacting laws with those prescribed for the valid submission by the houses of amendments to the Constitution discloses many differences essential for the valid enactment of laws, and not at all prescribed by the Constitution when the object of the houses is to submit an amendment to the Constitution to the judgment of the electorate. It is not necessary to enter upon an enumeration of all these differences, since they are readily discoverable upon a comparative reading of the two distinct systems. One contemplates the enactment of laws of a permanent nature; while the other contemplates the mere submission of propositions for electoral consideration and action, upon the affirmative response to which by the requisite majority of the electorate the proposal submitted by the houses becomes a part of the Constitution of the state, not an element of the statutory law of the state.

[1] It is not debatable in this jurisdiction that the inquiry whether the organic law has been validly, effectually amended is, under the Constitution, a judicial question. The suggestion to the contrary was finally concluded by this court in Collier, Governor, v. Frierson, 24 Ala. 100, 109, decided in 1854, where it was aptly said:

"We entertain no doubt that, to change the Constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The Constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said

that certain acts are to be done, certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the Legislature or any other department of the government can dispense with them? To do so would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

[2] Under the method prescribed by the mentioned sections of the Constitution for the formulation an'd submission of amendments, two things are necessary to be done in each of the houses, viz.: (a) "The proposed amendments shall be read * * * on three several days"; and (b) "three-fifths of all the members elected" to each house shall vote in favor of the submission of proposed amendments, whereupon an election shall be ordered by the Legislature upon the amendment or amendments so favored. While there is, as stated, a requirement that a proposed amendment shall be read in each house on three several days, there is no provision of the Constitution requiring that such readings shall be affirmatively shown on or by the journals of either or both of the houses. It is required by section 287 that "all votes of the Legislature upon proposed amendments to this Constitution, * * * shall be taken by yeas and nays and *entered on the journals*." (Italics supplied.) This court long since accepted and has often applied the rule that, unless the Constitution expressly requires the journals to show certain action by the houses, the presumption will be indulged, if not refuted by the recitals of the journals themselves, that the Legislature observe'd the prescriptions of the organic law prescribing methods for the exercise of the functions of that department. State v. Buckley, 54 Ala. 599, 613; Harrison v. Gordy, 57 Ala. 49; Walker v. Griffith, 60 Ala. 361, 366, 367; Cooley's Con. Lim. pp. 193-195. The reason and conservative result of this rule impels its application to the system provided by our Constitution for proposing amendments thereto or for proposing to the electorate the convention of a body to alter the Constitution. The requirement for several readings of subjects of consideration by legislative bodies as directed to the purposes, among others, of preventing hasty and ill-advised action, to the assurance of cautious and deliberate judgment by the bodies. Cooley, p. 117; 36 Cyc. pp. 949, 950.

[3] The requirement of three readings in each house of proposed amendments to the Constitution (section 284) was not intended to exact these six readings of a proposed amendment in hæc verba in both houses. To so affirm would exclude the right of the houses to amend, and thereby to perfect proposals for the submission to the electorate of amendments to the Constitution. The very purpose of the requirement of several readings in the houses of subjects of legislative action—whether with the view to the enactment of laws or to the submission of amen'dments to the Constitution to the electorate—is to assure the cautious, conservative deliberation of the bodies thereupon, a process that always implies, within constitutional limitations, the possession of parliamentary means whereby the subject of consideration may be made to harmonize with the judgment of the requisite majority in the respective bodies, and thus perfect the product of their deliberation. Any other interpretation would result in the necessity of commencing anew a whole series of readings every time an amendment was desired by either of the houses. The act of either house in dissenting from even the phraseology of the proposed amen'dment to the Constitution would only operate as a quasi veto, the effect of which would be to relegate the proposal to the stage of an original proposition. It is entirely unreasonable to suppose that the makers of the Constitution intended any such limitation upon the process by which amendments to the Constitution could be proposed. There is no such limitation written in the organic law; nor is there anything in it upon which to found an implication to that end.

[4] There are limitations in the Constitution with respect to the amendment of bills on their passage. Const. §§ 61, 64, and annotations thereto in Cr. Code, pp. 64, 65. Not so with respect to proposals for the submission to the electorate of amendments to the Constitution. The fact that such proposals may be submitted through bills or acts (Const. § 287) 'does not effect to impose upon this means for submitting such proposals the restrictions that the organic law imposes upon the legislative function of enacting statutes. If it had been the purpose of the makers of the Constitution to impose such restrictions upon an act proposing an amendment to the Constitution, surely that purpose would not have been left to lie in inference; and, besides, there would have been no occasion to insert the prescription in section 287 that the yeas and nays should be taken and entered on the journals, since in the case of bills and acts section 63 of the Constitution had already established that requirement. It is apparent from the system provided by sections 283–287 of the Constitution, looking to the consideration by the houses and by the electorate of the amendment thereof, that the intent was to construct a distinct system for amending or for generally revising the Constitution; and this view is confirmed by the fact that distinct standing committees were constituted by the constitutional convention of 1901 for the respective services of formulating a legislative system and of constructing a system for amending or for revising the Constitution.

[5] Our construction of this feature of section 284 of the Constitution is further confirmed by what appears to be the generally an'd long accepted interpretation of the legislative bodies in considering, formulating, and submitting amendments to the Constitution of this state. The availability of this means for correctly interpreting the organic law is well established in this jurisdiction. Moog v. Randolph, 77 Ala. 597, 606; Ex parte Hardy, 68 Ala. 303, 318; Cooley, pp. 102–107; Farrior v. Mortgage Co., 88 Ala. 275, 279, 7 South. 200; 8 Cyc. pp. 736, 737. Reference to the journals of the House and Senate since the Constitution of 1901 became operative discloses that those bodies have, without question or doubt, construed section 284 as not requiring three readings in each house of the identical proposal for the amendment of the Constitution, an'd that the process of harmonizing and perfecting a proposed amendment to the Constitution has been repeatedly, unvaryingly recognized and acted upon. See House Journal 1907, pp. 2924, 3555, 4003; House Journal 1909, pp. 46, 118, 425; Id. pp. 150, 305, 687; House Journal 1915, pp. 794, 820, 1088, 1343; Id. pp. 688, 1095, 952; Id. pp. 1110, 2041, 4089; Senate Journal 1915, pp. 420, 447, 452, 588; Id. pp. 664, 716, 825, 3547. The recently submitted amendment to allow local taxation for school purposes, voted upon and approved at the general election in 1916, is an illustration of the state'd legislative interpretation of the requirement that three readings in hæc verba in each house of a proposed amendment to the Constitution was not the effect of the constitutional mandate in that regard.

[6] Section 285 of the Constitution makes this exclusive prescription with respect to the ballot whereby the electors may express their approval or disapproval of amendments proposed to the Constitution:

"Upon the ballots used at all elections provided for in section 284 of this Constitution the *substance* or *subject-matter* of each proposed amendment shall be so printed that the *nature* thereof shall be clearly indicated. Following each proposed amendment on the ballot shall be printed the word 'Yes' and immediately under that shall be printed the word 'No.' The choice of the elector shall be indicated by a cross-mark made by him or under his direction, opposite the word expressing his desire, and no amendment shall be adopted unless it receives the affirmative vote of a majority of all the qualified electors who vote at such election." (Italics supplied.)

What matter descriptive of the proposed amendment the ballot shall contain in order to conform to this mandate of the Constitution depends, as appears, upon the meaning and effect of the terms, in their respective relations, "substance," "subject-matter," and "nature," italicized in the above reproduction of section 285.

It is provided in section 284 that notice of the election on proposed amendments to the Constitution shall be given by the Governor "for at least eight successive weeks next preceding the day appointed for such election." This notice includes the publication of the proposed amendments themselves. One object of the notice is to advise the electors of the terms of the amendments. Having made this adequate provision for the information of the electors in respect of the terms of the proposed amendment to the Constitution, it is clear that it was not the purpose to have the ballot's contents inform the voters of that which they had, it must be assumed, been fully advised through the notice published by the Governor. The sole object of the requirement of section 285 was to formulate a proposition upon which the voter might indicate his choice by making a "crossmark * * * opposite the word ['Yes' or 'No'] expressing his desire." This court has defined the word "substance," as it is employed in section 106 of the Constitution; the purpose of that section being to exact public notice of the substance of a proposed local law. Wallace v. Board of Revenue, etc., 140 Ala. 491, 501–503, 37 South. 321, State v. Williams, 143 Ala. 501,[1] and State, etc., v. Tunstall, 145 Ala. 477, 40 South. 135, among others. In view of the plain object in establishing the requirement, "substance" was there interpreted as meaning an abstract or compendium of the proposed local law. The different purposes the makers of the Constitution had in mind in prescribing in section 106 public notice of a proposed local law and in formulating a proposition for ballot service in enabling the electors to express their desires on an amendment to the Constitution render the line of decisions to which we have just referred of little, if any, value in determining the meaning and effect of the term "substance" as employed in section 285 of the Constitution. The term "nature" is used in the Bill of Rights (Const. § 6) in the connection that it assures one accused the right "to demand the nature and cause of the accusation." The significance accorded the term "nature" in that relation is also of little, if any, value in construing the same word in section 285 of the Constitution, because there, as in in the employment of the word "substance" in section 106, the object is to inform. 5 Words and Phrases, pp. 4673, 4674; 3 Words and Phrases, p. 523. The exaction in this respect of section 285 is that the nature of the proposed amendment shall be clearly indicated on the ballot; and the means to effect this end is that the "substance or subject-matter" of the proposed amendment "shall be *so* printed" (italics supplied) on the ballot as to clearly indicate the nature of the proposed amendment.

[7] The mandate of this section is directed to the clear indication of the nature of the proposed amendment, not, as in section 106, to the imparting of information to the electorate, which service has been provided by

[1] 39 South. 276.

publication before the day appointed for the election. This prescription for the ballot does not exact the printing thereon of the "substance or subject-matter" of the proposed amendment any further than is necessary to clearly indicate the nature of the proposed amendment. It thus appears that the imperative requisite of the section (285) in this respect is controlled by the intent of the makers of the Constitution in their use of the word "nature" in defining what matter descriptive of the proposed amendment shall be printed on the ballot. As employed in section 285, "nature" means kind, species, character, or sort. State v. Murphy, 23 Nev. 390, 48 Pac. 629; 29 Cyc. p. 283; Webster's New Int. Dict. Its significance, as therein used, may be also stated in the form of this definition: "The sum of qualities and attributes which make a thing what it is, as distinct from others." Ford v. Baker (Tex. Civ. App.) 33 S. W. 1037; Webster's New Int. Dict.; 29 Cyc. p. 283. In order to clearly indicate the "kind, species, character, sort" of the proposed amendment, to clearly indicate the "sum of the qualities and attributes which make" the proposed amendment "what it is, as distinct from others," the "substance or subject-matter" of the proposed amendment must be "so printed" on the ballot as to effect the clear indication of its nature, not the reproduction of its subject-matter or substance, but the recitation of only so much thereof as will serve to clearly indicate the nature of the proposed amendment. No more is required, and no less will suffice to satisfy the Constitution's mandate in this regard.

[8] This is a bill to enjoin the board of revenue of Montgomery county from paying out funds under the provisions of an amendment to the Constitution. The proposed amendment is set forth in General Acts 1915, p. 211. The report of the appeal will reproduce the proposed amendment. It was submitted to the voters of the state at the general election held on Tuesday after the first Monday in November, 1916. On the ballot this proposal was undertaken to be noted as "Proposed Amendment No. 2." A majority of the electors voting on that proposal favored the proposition; and it was adopted as a part of the Constitution if the method pursued in its submission and in the formation of the ballot were those exacted by the Constitution. Harris v. Walker, 74 South. 40.[2] The purposes of the proposed amendment were to put the judge of probate, the sheriff, the tax collector, and tax assessor of Montgomery county on certain salaries, and to make certain allowances with respect thereto, and to require the fees incident to these offices to be covered into the county treasury, and to authorize the Legislature by general or local law to thereafter from time to time fix, regulate, and alter the amount of the salaries and allowances named in the amendment, including the method and basis of their compensation, and to fix, regulate, and alter the amount of compensation received by all other county officers of Montgomery county. The amendment was proposed through the means of a bill or act first introduced in the House. It was read and referred to the committee on local legislation. This committee reported it favorably; and on second reading the bill was placed on the calendar. On January 26, 1915, the bill came on for third reading. A substitute was offered, and adopted by yea and nay vote in the House, and the substitute was passed, having been read at length (House Journal, pp. 575–581); and thereupon the substitute was sent to the Senate, where it was read at length on three several days and passed. It thus appears that in the House the substitute was not read three times, on as many several days. It results from the stated construction of section 284 of the Constitution that the "readings" given in the House met the requirements of that section of the Constitution. Substitution, as there effected, was but a form of amendment. Cushing's Law of Leg. Assemblies, § 2203; State v. Buckley, 54 Ala. 599, 613.

[9] From the recitals of the House Journal otherwise (pages 279, 306) it appears, under the heading, "Bills on First Reading," that:

"The following bills were introduced, severally read one time and referred to appropriate standing committees as follows, when raised. * * * "

Among many other house bills, this one, numbered 108, was referred to the committee before mentioned; the title thereto, following its number, being alone reproduced in the journal at page 306. Aside from the considerations before stated in our construction of section 284, with respect to its requirements as to readings, it is clear from the recital just quoted and from the journal's reference to the second reading (House Journal, pp. 445, 446) of House Bill 108 that the readings were of the bill, not the caption or title. But even if it were not thus clear from the House Journal's recitals, the presumption would be that the readings required by the Constitution were accorded the bill, since there is nothing to the contrary in the journal, and since the Constitution does not exact that the journal affirmatively show that the readings required were in fact accorded the bill. Authorities supra.

The official ballot used in this election was thus captioned:

"Proposed Amendments to the Constitution of Alabama.

"Submitted to an election of the qualified electors of the state to be held on Tuesday after the first Monday in November, 1916. Under each amendment is printed the word 'Yes' and immediately under that is printed the word 'No.' Each elector will express his choice by a cross-mark (X) made by him or under his discretion [direction] opposite the word expressing his desire."

[2] 199 Ala. 51.

The proposed amendment here in question was referred to in order on the official ballot:

"Proposed Amendment No. 2.

"Shall the Constitution of Alabama be amended so that the judge of probate, sheriff, tax assessor and tax collector of Montgomery county will be placed on salary and required to cover the fees collected by them into the treasury of Montgomery county?

"(   ) Yes.
"(   ) No."

[10] A comparison of the matter printed on the ballot with the provisions of the proposed amendment discloses that the matter printed on the ballot omitted reference to those two features of the proposed amendment providing: (a) That hereafter the Legislature may from time to time fix, regulate, and alter the amount of the named salaries and allowances; and (b) that the Legislature may from time to time fix, regulate, and alter the amount of compensation received by all other county officers of Montgomery county. It is contended, and was so ruled below, that these omissions rendered the ballot deficient under the provisions of section 285, quoted before, in, that the matter on the ballot did not embrace "the substance or subject-matter" of the proposed amendment so as to clearly indicate the "nature" thereof. It is compliance with the Constitution (section 285), not with the directions of the act accompanying and proposing the amendment, that determines the validity, the efficacy, of the official ballot in these circumstances. Nevertheless and by the way, it is strange that in the preparation of this feature of the official ballot the legislative directions given in this instance with respect to what the official ballot should contain (Gen. Acts 1915, p. 213) seems to have been at least incautiously ignored. Of course, if the ballot matter recited in an act was deficient, and that placed on the ballot met the exactions of the Constitution (section 285), and the requisite majority approved the proposal, the amendment of the Constitution would be effected, notwithstanding the deficiency of the act's recital in that particular; yet conservative considerations in such important matters would seem to at least invite the taking of cautious account of the suggestion of the legislative bodies.

[11] The interpretation of the feature of section 285 prescribing what the ballot should contain prevailing with the court below appears to have proceeded on the incorrect theory that the matter to be printed on the official ballot should be the "substance or subject-matter" of the proposed amendment, a theory that is correctly illustrated by the terms to that effect employed in section 106 of the Constitution where public notice of local laws to be proposed is the purpose of the requirement; whereas the exaction of section 285 in this particular is only directed to formulating a proposition for electoral service and hence restricts the requirement with respect to "substance or subject-matter" of the proposed amendment to the sole end of clearly indicating the nature of the proposed amendment. If section 285 had prescribed that the "substance or subject-matter" of the proposed amendment should be printed on the official ballot, this ballot would have been fatally deficient, because of omissions. Such not being the purpose or effect of the prescription for the ballot in section 285, the inquiry in this connection is: Was the "substance or subject-matter" of the proposed amendment printed on this ballot efficient to clearly indicate the nature of the proposed amendment? There were six amendments to the Constitution proposed by the houses in 1915, and these proposals were submitted on one ballot at the general election in 1916. It is manifest from a view of the whole official ballot and the proposals so submitted that no voter could have been misled or confused as between any of the six propositions subject to his ballot. This consideration compels the conclusion that the matter printed on the ballot under the heading "Proposed Amendment No. 2" served to plainly distinguish the proposal now under judgment from the other five proposed amendments described on the official ballot. The nature of this proposed amendment was to effect the change of the mode of compensating county officers in Montgomery county. Its nature was "clearly indicated" by the printed matter on the ballot; but its entire "substance or subject-matter" was not set forth in the matter printed on the ballot. The matter printed on the ballot plainly indicated the proposed amendment's kind, species, character, sort, the qualities and attributes which distinguished it. If the printed matter on the ballot had included the two features not specifically enumerated thereon, an abstract or compendium of the proposal would have been set forth on the ballot. This is not required. That which was printed on the ballot nominated and described, by means of a partial recital of important features of the substance or subject-matter of the proposal, the subject for the voter's expression of his desire.

[12] It is to be conclusively presumed that every voter received the benefit of the notice contemplated through the publication in extenso of this proposed amendment. That is the method by which the Constitution intends the electorate shall be informed of the contents of proposed amendments. The printed matter on the ballot is but the instrument provided for the voter's expression of his desire. It is a part, a vital part to be sure, of the Constitution's scheme to enable the voter to constitute his ballot a memorial of his choice in the premises; but, as has been stated, its function is not to inform and to advise the voter. He avails of the printed matter to declare his preference by the use on his ballot of the cross-mark opposite "Yes" or "No." According to the prescription of section 285 for the construction of the ballot, the validity of the ballot cannot be tested by

subjecting the ballot to the inquiry: Did the voter, in casting his ballot on this proposal, either approve or disapprove one or both of the features of the amendment which were not referred to in the matter printed on the ballot, since, if that was a test, not even an abstract or compendium of a proposed amendment would avert the invalidation of an election on a proposed amendment in which the ballot did not have printed on it everything the amendment contained.

In consequence of its formulation, its approval by the House and Senate and its submission to the electorate without offending the Constitution, the proposal has, by virtue of the approval of the requisite majority of the electors voting thereon, become a part of the Constitution of this state.

The decree appealed from is reversed; and, the bill being without equity, a decree is here rendered dismissing the bill.

Reversed and rendered.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.