**71 P.(2d) 140**

**HUTCHESON v. GONZALES, Secretary of State.**

**No. 4316.**

Supreme Court of New Mexico.

July 31, 1937.

J. O. Seth, of Santa Fe, and A. T. Hannett, John F. Simms, W. A. Keleher, Fred E. Wilson, and Joseph L. Dailey, all of Albuquerque, for plaintiff.

Frank H. Patton, Atty. Gen., Fred J. Federici and A. M. Fernandez, Asst. Attys. Gen., and H. A. Kiker and David W. Carmody, both of Santa Fe, and Stanley W. Miller, of Albuquerque, for defendant.

BICKLEY, Justice.

The applicant asked leave to file in this court application for an alternative writ of mandamus against defendant and for this court to take original jurisdiction of this cause. Such leave was granted. It appears from the application, and from fact sources of which we take judicial notice, that by chapter 117 of the Laws of 1937, the Legislature by unanimous vote of each house thereof, 22 Senators voting in the affirmative, nays none, 2 Senators being absent, and 34 members of the House voting in the affirmative, none in the negative, the others being absent, called a special election to be held throughout the state on September 21, 1937, for the purpose of approving or rejecting any and all amendments to the Constitution of the state of New Mexico proposed at the current session, and provided in said enactment that such special election shall be proclaimed, held, conducted, and counted in the same manner and be subject to the same regulations as are now prescribed by law for general elections, not inconsistent with said act; that said Legislature proposed 4 amendments to the Constitution of the state of New Mexico by 4 duly adopted joint resolutions known as Senate Joint Resolution No. 3, Senate Joint Resolution No. 14, House Joint Resolution No. 24, and House Joint Resolution No. 25. It is averred in the application that by article 19, section 1, of the Constitution it is made the public duty of the Secretary of State to cause each and all of said amendments to be published in the manner provided by law; that the defendant claims and asserts that by reason of the filing with her, in her office, as Secretary of State, of referendum petitions alleged to contain the names of more than 25 per cent. of the qualified electors in more than three-fourths of the counties of the state of New Mexico, directed against said chapter 117 of the Laws

of 1937, that said act is suspended and automatically referred to the general election in November, 1938, for approval or disapproval; and that she will not publish notice of said special election of September 21, 1937, unless required so to do by a court of competent jurisdiction. Said application also contains the following:

"That chapter 117 of the Laws of 1937, is not subject to being suspended by referendum petitions or otherwise, and cannot be by said petitions, or otherwise, referred to the electors of this state at the next general election in November, 1938, for the following reasons, to-wit:

"A. Because article 19, section 1, of the Constitution of the State of New Mexico, affirmatively requires that the said four proposed Constitutional Amendments shall .be submitted to the said special election called for September 21, 1937, by Chapter 117 of the Laws of 1937, and does not permit a referendum thereon; and

"B. Because chapter 117 of the Laws of 1937, is a. special law, not subject to referendum, under the provisions of article 4, section 1, of the Constitution of the State of New Mexico; and

"C. Because the referendum cannot be lawfully or legally employed by twenty-five per cent. of the electors in three-fourths of the counties of the state to prevent all of the electors of the State from voting on said four proposed Constitutional Amendments at the special election called for September 21, 1937; and

"D. Because the referendum provided by article 4, of the Constitution of the State of New Mexico cannot lawfully be used for the purpose of referring to the general election of 1938, chapter 117 of the Laws of 1937, calling the special election for September 21, 1937, for the reason that so to employ said referendum would be, in effect, to repeal chapter 117 of the Laws of 1937, because to postpone a vote upon the matter of approving ·or rejecting chapter 117 of the Laws of 1937, until more than a year after the only date on which it could be effective, to-wit: September´21, 1937, would be, in effect, permitting twenty-five per cent. of the voters in three-fourths of the counties of the State of New Mexico to nullify chapter 117 of the Laws of 1937, even though the same might receive a majority of the votes of all of the electors. in the general election of 1938.

"That applicant is a citizen and resident of the State of New Mexico and County; of Bernalillo, and is a qualified elector of said state and county, and is entitled to vote at all elections, and that he, in common with all other electors of said state, is interested in the matter of having said special election lawfully called and held· on September 21, 1937, and is entitled to vote therein, and that as such qualified. elector, his rights are affected, in common with those of all other citizens and electors of the state, by the alleged failure and refusal of the defendant, as Secretary of State of New Mexico, to discharge a public duty, to-wit: the causing of said proposed amendments to be published as required

by article 19 of the Constitution of the State of New Mexico, and that the State of New Mexico, as a state, is not concerned with the question of the calling and holding of said special election.

"That circumstances, which, in the opinion of the applicant render it necessary and proper that the Alternative Writ of Mandamus issue originally from this court and not from any other court in the State of New Mexico, are as follows:

"That owing to the short length of time that now remains before the time when the Secretary of State is required to commence publication of said proposed Constitutional Amendments as required by article 19, of section 1 of the Constitution of New Mexico, it would be impossible for the applicant to proceed in the District Court and have the cause reviewed by the Supreme Court of New Mexico before said publications should be commenced and started, in order to comply with the constitutional requirements pertaining thereto;

"And inasmuch as the Secretary of State has been advised by the office of the Attorney General of New Mexico that she is under no duty to publish said proposed amendments, but that the filing of the referendum petitions in her office has relieved the Secretary of State of the duty to so publish said proposed amendments, and pursuant to said advice the Secretary of State has asserted that she will not publish said proposed amendments, unless and until so required by a court of competent jurisdiction, it would be futile for your applicant to attempt, by mandamus to compel the Secretary of State to do what your applicant alleges to be her public duty, in other forum or court than the Supreme Court of the State of New Mexico."

An alternative writ of mandamus was issued. All the pertinent facts are admitted either by the writ and answer of defendant or subsequently by her counsel at the hearing, coupled with a challenge of the legal conclusions drawn therefrom by the plaintiff. Defendant by her answer raises certain specific defenses in support of her refusal to proclaim and call the special election.

■ It seems appropriate to consider first the claim of plaintiff that the enactment calling the special election is not legislation as contemplated by article 4 of the New Mexico Constitution, because if this point should be ruled in favor of defendant, her other defenses would be of no further interest to her.

Article 4 of the New Mexico Constitution is entitled: "Legislative Power—Where Vested—Senate and House—Referendum." A portion of section 1 of said article 4 is as follows:

"The people reserve the power to disapprove, suspend and annul any law enacted by the legislature, except * * * laws providing for the preservation of the public peace, health or safety."

It was asserted on July 4, 1776, by the framers of the Declaration of Independence that all men "are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of

Happiness. That to secure these rights, *Governments are instituted among Men,* deriving their just powers from the consent of the governed." They further declared that when certain popular rights were infringed upon, it was "the Right of the People to alter or to abolish it, and to institute new Government."

After vindicating these principles by discharging their pledge of their lives, fortunes, and honor, a government was instituted which went through changes until it was charted in the Constitution of the United States. The preamble of that Constitution, besides being one of the finest sentences ever written, is one of the most comprehensive:

"We the people of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquillity, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this CONSTITUTION for the United States of America."

There it all is, our chart and our creed. It is the fruition of the hopes of those who framed the Declaration of Independence.

The men who sat in the convention of 1787 were not sanguine enough to suppose their work could stand unaltered for all time to come. They provided a process of amendment. "The Right of the People to alter or abolish" their form of government and institute another in its stead was taken care of by peaceable and orderly means

in order to preserve "the public peace, health or safety," without the privations, suffering, and sacrifice incident to revolution of the character they had just gone through.

Mr. Bryce in "The American Commonwealth" in a chapter on "Direct Legislation by the People" through amendments to State Constitutions, vol. 1, p. 456, says:

"It has been well observed by Dr. von Holst (Constitutional Law of the United States, § 90) that the completeness and consistency with which the principle of the direct sovereignty of the whole people is carried out in America has checked revolutionary tendencies, by pointing out a peaceful and legal method for the effecting of political or economical changes, and has fostered that disposition to respect the decision of the majority which is essential to the success of popular governments."

The spirit and objects of our State Constitution, which was approved by Congress, submitted by referendum to the voters, and adopted by our people, are of like character. The history of article 19 of the New Mexico Constitution serves to further emphasize the importance as relating to the public peace and safety of having at hand a liberal means of amending the Constitution. Appellant attaches to his brief a copy of a complete report of the Flood Committee in Congress regarding the approving of the New Mexico Constitution. Interesting as it is, it is too long to quote in full, and we employ instead a portion of the observations of appellant thereon, as follows:

"In this respect we call to the court's attention the fact that when the constitution was originally drawn article 19, providing for the amendments thereof, provided a very difficult manner for the adoption of amendments to the state constitution. A proposed amendment could only be submitted upon a two-third vote of each house and, except in extraordinary circumstances, could only be submitted to a vote of the people at a regular election once each eight years. Taking these provisions, in connection with the legislative distribution provided for in the constitution, the Flood Committee points out that possibly four counties in the state could block an amendment to the state constitution and the Committee commented upon the unfairness of said article 19. In view of the Committee's report, another Article was drawn and adopted by the people as our present article 19. This new section 1 of article 19 is much more liberal than the original. It provided for proposed amendments to be adopted by a mere majority of both houses of the legislature and for a submission of the proposed amendments at a special election as well as at a general election. The sequence of events in the connection of the drawing of this new article is interesting. When the constitution was originally drawn ·as a whole, as pointed out before, amendments could be submitted only at a general election. The legislature had no discretion whatever in the matter. The new section 1 of article 19 was prepared after the balance of the constitution, including article 4, had already been prepared and agreed

upon. It seems to us rather unreasonable, therefore, to contend that the persons preparing the constitution could have had, by the referendum power contained in section 1 of article 4, reference to any of the acts of the legislature performed by virtue of the power given in section 1 of article 19, which was prepared and its provisions made afterwards."

Can any one doubt that "governments are instituted among Men, deriving their just powers from the consent of the governed" for the broad general purpose of "the preservation of the public peace, health or safety"? To this end, did the members of our constitutional convention frame and promulgate and the electors at a referendum thereof ordain and establish our State Constitution?

How then can "any law enacted by the Legislature" which is enacted pursuant to article 19 of our Constitution providing for amendment thereof, and without which article 19 there would have been no warrant or occasion for such enactment, the sole purpose of which is to effectuate such process of amendment or referendum upon the advisability thereof, be said to be other than a law "providing for the preservation of the public peace, health or safety"? These considerations emphasize the argument of counsel for plaintiff that the law sought to be referred is not legislation as contemplated by article 4 of our Constitution, if indeed they do not prove that such law is expressly excepted from the operation of section 1 of said article 4, viewed as an enactment emanating from the Legis-

lature by virtue of its strictly legislative power, as contended by defendant. We are much intrigued with the thought, but since the argument of plaintiff did not take that form, we now consider his, which in effect amounts to the same thing, or at least, if found to be sound, accomplishes a like result.

Plaintiff's proposition is thus stated in his brief:

"Chapter 117, New Mexico Session Laws of 1937, is not referable for the reason that it is not legislation as contemplated by article 4 of the New Mexico Constitution.

"(A) The authority given to the Legislature to initiate constitutional amendments by article 19 of the New Mexico Constitution is entirely separate from the ordinary legislative power of the legislature and is not subject to the provisions affecting general legislation under article 4 of the Constitution.

"(B) Every provision which it is necessary for the Legislature to make for the purpose of exercising the power given it to propose and submit constitutional amendments falls in the same category as proposed amendments themselves."

The article 19 referred to is as follows:

"Proposing amendments. Section 1. Any amendment or amendments to this constitution may be proposed in either house of the legislature at any regular session thereof; and if a majority of all members elected to each of the two houses voting separately shall vote in favor thereof, such proposed amendment or amendments shall be entered on their respective journals with the yeas and nays thereon.

"The secretary of state shall cause any such amendment or amendments to be published in at least one newspaper in every county of the state, where a newspaper is published once each week, for four consecutive weeks, in English and Spanish when newspapers in both of said languages are published in such counties, the last publication to be not more than two weeks prior to the election at which time said amendment or amendments shall be submitted to the electors of the state for their approval or rejection; and the said amendment or amendments shall be voted upon at the next regular election held in said state after the adjournment of the legislature proposing such amendment or amendments, or at such special election to be held not less than six months after the adjournment of said legislature, at such time as said legislature may by law provide."

This article is entitled "Amendment." It deals solely with the method of amending the Constitution.

What then is the nature of the authority reposed in the Legislature to initiate constitutional amendments?

As heretofore stated, in earlier times the necessity of means of affecting changes in written Constitutions was felt. Thus we had constitutional conventions with referendum upon the entire Constitution. When Constitutions so adopted were thought to require change, there developed another referendum on the subject of assembling a new convention to revise the Constitution.

"The people were to vote 'convention' or 'no convention,' as they might prefer, and such changes as the body might make in the organic law, should the people authorize it to meet, would have then to be submitted 'to the decision of the citizens of this state * * * together or in distinct propositions as to them (the members of the convention) shall seem expedient.' "

The foregoing is an illustration given by Oberholtzer, "The Referendum in America" at page 131. Dr. Oberholtzer then at chapter 6 discusses "The Amendment of Constitutions by the Legislative Method." He says at page 144:

"The need was soon felt, and it had been prophetically anticipated in Maryland and Delaware in 1776, for some easier mode of amendment than by assembling a new convention. The legislature was holding sessions frequently. While it was engaged in its own specific line of work, it might too act in the capacity of a convention in adopting, or at any rate in proposing for adoption, such amendments to the constitution as might seem to be required from time to time for the good of the state. From the beginning it was understood that in enacting constitutional law, even to this extent, the legislature was stepping outside of its own rightful province."

Again at page 150, the author speaks of the citizens "amending their constitutions by legislature ad referendum." At page 155 he speaks of Legislatures so proceeding as "acting in their capacity as makers of the fundamental law."

The same thought is expressed by Hoar in his work on "Constitutional Conventions." He devotes an interesting chapter to "Legislatures as Conventions." A portion thereof delineates the capacity in which a Legislature acts in instituting constitutional amendments. At page 82 he says:

"The legislature, in taking any steps toward the framing of a constitution, does not act in its legislative capacity. * * * Many decisions bearing more or less on this point, but relating more particularly to the extra-legislative nature of the proposal of constitutional amendments are collected in the Indiana decision. (Ellingham v. Dye, 178 Ind. 336, 99 N.E. 1, Ann.Cas.1915C, 200, which we referred to in Asplund v. Hannett, 31 N.M. 641, 249 P. 1074, 58 A.L.R. 573, as 'a case of surpassing interest as regards the principal questions decided.')

"Furthermore, the Indiana decision says that in the ordinary legislative method of constitutional amendment, the legislature is quoad hoc empowered to act as a convention.

"By express constitutional provision, they act in conventional capacity, in the way of recommending specific amendments to their constitution.

"The Indiana court quotes with approval the following from the Supreme Court of Arkansas [State v. Cox, 8 Ark. 436, 443]: 'The General Assembly, in amending the constitution, does not act in the exercise of its ordinary legislative authority, of its general powers; but it possesses and acts in the character and capacity of a conven-

tion and is quoad hoc, a convention expressing the supreme will of the sovereign people.'

"And Jameson's following comment thereon: 'It expresses with admirable brevity, force, and clearness, the true doctrine in regard to the power of our General Assemblies under similar clauses of our Constitutions.' "

As bearing upon this question, the author says at page 81:

"The two houses and the governor constitute the entirety of the body which considers and finally determines all matters of legislation. But it is the two houses and the great mass of the electors of the commonwealth combined which constitute the body which considers and determines the questions of constitutional amendment. With all matters of legislation the people in their capacity of electors have nothing to do. But with constitutional amendments they have everything to do, for the ultimate fate of all proposed amendments depends absolutely upon their approval. If they approve, the proposed amendment at once becomes a part of the constitution; if they disapprove, it fails utterly and never comes into existence. The fundamental distinction which thus becomes most manifest, between the mere legislative machinery of the government, and that machinery which alone possesses the power to ordain amendments to the constitution of the commonwealth is most radical and extreme."

Citing Commonwealth v. Griest, 196 Pa. 396, 46 A. 505, 506, 50 L.R.A. 568, an extremely well-reasoned case from which we quote briefly:

"It will be observed that the method of creating amendments to the constitution is fully provided for by this article of the existing constitution. It is a separate and independent article, standing alone and entirely unconnected with any other subject. Nor does it contain any reference to any other provision of the constitution as being needed or to be used in carrying out the particular work to which the eighteenth article is devoted. It is a system entirely complete in itself; requiring no extraneous aid, either in matters of detail or of general scope, to its effectual execution. It is also necessary to bear in mind the character of the work for which it provides. It is constitution-making,—it is a concentration of all the power of the people in establishing organic law for the commonwealth; for it is provided by the article that, 'if such amendment or amendments shall be approved by a majority of those voting thereon, such amendment or amendments shall become a part of the constitution.' It is not lawmaking, which is a distinct and separate function, but it is a specific exercise of the power of a people to make its constitution. * * *

"*The subsequent provisions of the article are equally devoid of any right or authority to intervene, derived from any source whatever.* * * *

"It remains only to consider the reasons which are urged against the validity of such a conclusion. They are all concentrated and find their only life in the provisions of

another article of the constitution, to wit, the third, in the twenty-sixth section of which, it is contended, there is a provision which makes it necessary to the validity of a proposed amendment that it must be submitted to the governor for his action thereon, and that, if he disapproves of it, it fails at once, and no further proceedings can take place, in the way of its establishment, unless his disapproval shall be overcome by a vote of two-thirds of the members of both houses. The seriousness and gravity of this proposition will be at once conceived, when it is considered that it confers upon the governor, alone, the power to prevent the adoption of an amendment to the organic law of the state, by a mere exercise of his veto power, unless the amendment is passed over his veto by a two-thirds vote of the members."

After discussing in detail the provisions of the Pennsylvania Constitution corresponding to article 4 of our Constitution, the court makes observations equally applicable to our article 4:

"*Nowhere* in the article is there the *slightest reference* to or provision for the subject of *amendments* to the constitution. It is not even alluded to in the remotest manner. On the contrary, the entire article is confined *exclusively* to the subject of legislation; that is, the actual exercise of the lawmaking power of the commonwealth, in its usual and ordinary acceptation. It is too plain for argument that, unless there were somewhere else in the constitution a provision for creating amendments thereto, that power could not be exercised under any provision of the third article. It follows that a direction to submit 'every order, resolution or vote' of the two houses to the governor for his approval does not carry with it any other matter than such as is authorized by the article. As constitutional amendments are not authorized by the third article, they cannot be within the purview of those orders, resolutions, or votes which must be submitted for the action of the governor. * * *

"But the great and overshadowing distinction between this and the ordinary legislation lies in the fact that the organism which *decides questions of constitutional amendment* is an entirely different and distinct organism from that which decides questions of legislation, even in its broadest sense. The two houses and the governor constitute the entirety of the body which considers and finally determines all matters of legislation. But *it is the two houses and the great mass of the electors of the commonwealth, combined, which constitute the body which considers and determines questions of constitutional amendment.* With all matters of legislation the people, in their capacity of electors, have nothing to do. But with constitutional amendments they have everything to do, for the ultimate fate of all proposed amendments depends absolutely upon their approval. If they approve, the proposed amendment at once becomes a part of the constitution. If they disapprove, it fails utterly and never comes into existence. *The fundamental distinction* which thus becomes most manifest between the mere legislative machinery of

the government and that machinery which alone possesses the *power to ordain amendments* to the constitution of the commonwealth is most radical and extreme. Hence it follows, by an inevitable conclusion, that when the twenty-sixth section of the third article of the constitution says that 'every order, resolution, or vote' of the two houses shall be submitted to the governor for his approval or disapproval, it does not and cannot have any reference to the action which the two houses take in performing their part of the work of creating amendments. After them comes the governor, in matters of legislation, but after them come the electors of the commonwealth, in matters of constitutional amendment. In the latter the power and will of the people are final and conclusive. In the former the power and the will of the governor are supplemental only. His action may be final, or it may not; depending on an ultimate vote of the two houses by a two-thirds, instead of a majority, vote. If it is two-thirds, he is not an element, even in matters of legislation, but he is never an element in matters of constitutional amendment. Before passing to the question of authority, only one more thought needs expression. *It is that these two articles of the constitution are not inconsistent with each other, and both may stand and be fully executed without any conflict.* One relates to legislation only, and the other relates to the establishment of constitutional amendments. *Each one contains all the essentials for its complete enforcement without impinging at all upon any function of the other.* And it follows, further, that, because each of these articles is of *equal dignity and obligatory force* with the other, *neither* can be used to change, alter, or overturn the other. It is not a tenable proposition, therefore, that because the twenty-sixth section of the third article requires that all orders, resolutions, and votes of the two houses shall be submitted to the governor, the same provision shall be thrust into the eighteenth article, where it is not found and does not belong." (Italics ours.)

Vol. 6 Ruling Case Law, at page 28, states the matter in this way:

"In submitting propositions for the amendment of the constitution, the legislature is not in the exercise of its legislative power, or of any sovereignty of the people that has been intrusted to it, but is merely acting under a limited power, conferred upon it by the people, and which might with equal propriety have been conferred upon either house, or upon the governor, or upon a special commission, or any other body or tribunal."

In the case of Warfield v. Vandiver, 101 Md. 78, 60 A. 538, 541, 4 Ann.Cas. 692, the Maryland court recognized the distinction of the powers given the Legislature under an article of the Constitution dealing with amendments in the following language:

"Article 14 is a separate and distinct subdivision of the Constitution. It deals, in its first section, exclusively with the process of amending the Constitution, and

has no relation whatever to legislation. The other provisions in other articles to which allusion has been made are confined to lawmaking. This article is restricted to Constitution making; and the two subjects are widely disconnected in location and in substance."

Other cases which may be cited to sustain our views: Nesbit v. People (1894) 19 Colo. 441, 36 P. 221; State ex rel. Donnelly v. Myers, 127 Ohio St. 104, 186 N.E. 918; Hawke v. Smith, Sec. of State, 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871, 10 A.L.R. 1504; State of Missouri ex rel. Tate v. Sevier, 333 Mo. 662, 62 S.W.(2d) 895, 87 A.L.R. 1315; State ex rel. Morris v. Mason, 43 La.Ann. 590, 9 So. 776; McAlister v. State ex rel. Walton, 96 Okl. 143, 221 P. 779; Johnson v. Craft et al. (1921) 205 Ala. 386, 87 So. 375, 388. We quote with approval the following passages from the majority opinion on rehearing in the case of Johnson v. Craft, as applicable to instant case:

"The present review and reconsideration is thus reduced in scope and subject-matter to the point of an 'irreducible minimum.' The proposition earnestly urged is that the function and service of the Legislature in performance of its duty under article 18 of the Constitution, in proposing and submitting amendments to the Constitution, is divisible into two distinctive processes or actions, in the order to be stated, viz. formulating, upon constitutionally attained agreement of the two houses, a proposed amendment to the Constitution, and, this being done (permissibly concurrently)

as the necessary, natural precursor of and predicate for the other process, to wit, that of ordering the election, including a valid provision for the time it shall be held. * * *

"Recurring to the particular contention for the divisibility of the function of proposing and of submitting amendments to our Constitution: The analysis proposed in the arguments is a striking illustration of the well-known ability of counsel. More; it is pleasing to contemplate as the performance of lawyers of highest skill. Nevertheless, it is not sound. Viewed as the work of a surgeon, it would separate the heart from the body, leaving the body without the impulse of life. The heart of the simple, complete, separately provided, distinct system for amending the Constitution (Jones v. McDade, supra [200 Ala. 230, 75 So. 988]; Commonwealth v. Griest, 196 Pa. 396, 46 A. 505, 50 L.R.A. 568, 572, among others) is that which alone can infuse life into that which is lifeless, viz. a favorable election by the people on the amendment proposed. The body to become thereupon vital is the proposed amendment. The electoral function is not the body, but the heart that vitalizes the body. The argument proceeds in the reverse order of the factors to which it must refer. It unjustifiably exalts the mere order in which these two acts may be performed over the constitutional design and composite effect to which that action can alone relate. The design of article 18 is an entire scheme. To propose an amendment without providing for the election would be as much

a folly as providing for an election on an amendment not proposed. * * *

"If the Legislature as an entity, not in its law-making capacity, is the only agency that can formulate an amendment, how can it for a moment be thought, much less contended, that 'Legislature' was intended to have any different effect or design when the ordering of the election and fixing the time it should be held was the purpose of the makers of the Constitution? If 'Legislature' means the entity in one instance, it has the same meaning in the other."

We will find it convenient to apply the appellation "convention" to the Legislature when sitting with respect to the extra-legislative business of amending the Constitution ad referendum.

The plaintiff and defendant seem to be in agreement on one thing, and that is that article 19 provides for "such special election * * * as said legislature may by law provide."

Defendant says that this understanding of the clause should impel us to decide that in calling an election and setting the time thereof and providing the means therefor the Legislature acted in a legislative capacity and the calling of the election is *by law*. It follows, says the defendant, that since the election is called *by law* and since the people have reserved power under article 4 to direct a referendum against *any law* (not within express exceptions) chapter 117, Laws 1937, is suspended under the facts here presented.

We do not doubt that the procedure provided by the Legislature in session as a convention to amend the Constitution, which directs submission to the voters in order to effectuate the proposals for amendment is a law. The question is whether it is the kind of a law against which referendum may be directed under article 4.

Our Constitution, article 9, § 8, declares: "No debt * * * shall be contracted by or on behalf of this state, unless" (in the manner stated).

Surely taken literally, "no debt" is as comprehensive a term as the term "any law" employed in section 1 of article 4. But we held in State ex rel. Capitol Addition Bldg. Commission v. Connelly, 39 N.M. 312, 46 P.(2d) 1097, 100 A.L.R. 878, that reading all of the article 9, sections 8, 10, 12 and section 11, as amended, it was apparent that the term "debt" referred to obligations pledging for repayment general faith and credit of state or municipality, and contemplates levy of general property tax as source of funds with which to retire obligation. So our problem is not solved by concluding that the special election to submit the amendments was provided "by law."

The defendant says that the question here presented was decided in Clements v. Hall, 23 Ariz. 2, 201 P. 87, 89. We do not so understand that decision. At one place the court said:

"Whether the Legislature, in calling a special election acts in its capacity as a lawmaking body, or whether it is in the exercise of a delegated power that it makes

the call, we think it unnecessary to decide in this particular case, for the reason that it seems to us that the Legislature has done very much more than to call a special election. *If it has done anything it has provided the machinery for holding the election and authorized the incurring of the expenses necessary therefor.* Section 4, against which the referendum is filed, not only calls the special election, but adopts by reference a system of general laws, to wit, the general election laws, whether applicable or not. In other words, the procedure provided in the general election laws is required to be followed in holding the special election on November 9, 1921, in every respect except as to date." (Italics ours.)

The defendant says in her brief:

"A legislature in proposing amendments is not acting in legislative capacity, but in calling an election and setting the time it does act in legislative capacity and calling of election is by law."

Since from all of the foregoing we find no difficulty in reaching the conclusion that both in proposing the amendments and in providing for or calling the election the Legislature acts in the capacity of constitution-makers, and since defendant places great reliance on the decision in Clements v. Hall, supra, we follow it further to see whether her claim that chapter 117 appropriating money to pay the expenses of the election proves that it is a law passed by the Legislature as a convention pursuant to power vested in it by article 4, and even if so, whether such law is subject to the referendum provisions of section 1 of article 4. Defendant also relies on the case of Hatch v. Stoneman, 66 Cal. 632, 6 P. 734. Entertaining great respect, as we do, for the decisions of the courts of our neighboring states, we feel that the reasoning set forth in other decisions above cited is more persuasive. To some extent the Arizona decision is distinguishable.

That constitutional conventions may incur expense for legitimate needs is not doubted. Hoar, "Constitutional Conventions," p. 177. The same author, quoting Jameson, says that the convention may pledge the faith of the state for the necessary expenses. but warns that that is a different thing from pledging the credit of the state. He refers to the fact that the attempts of the earlier state constitutional conventions to appropriate money were successful, but that such attempts had been unsuccessful in later years, and that the opinions of the Attorney General of 3 of the states had ruled against the legality of such proceedings.

No case deciding the point has come to our attention. We think it would not be an unreasonable holding that a constitutional convention has incidental enacting capacity within the narrow range implied as necessary for the business of proposing questions of revision and submitting them to the people. See Opinion of the Justices, 76 N.H. 612, 85 A. 781. The New Mexico Constitutional Convention enacted provisions submitting the Constitution to the people, fixing the date of the election,

and declaring that "except as to the manner of making returns of said election and canvassing and certifying the result thereof, said election shall be held and conducted in the manner prescribed by the laws of New Mexico now in force," and provided the form of ballots, the method of making returns, and other details of the submission. See article 22, entitled "Schedule." The power to do so has never been questioned so far as we know.

And it would seem that when the Legislature acts as a convention to formulate and submit constitutional amendments, there would be a stronger case for saying that within the narrow range of measures necessary to effectuate the main business of amending the Constitution they would have implied capacity to appropriate money to defray the expenses they had the power to incur and to do all things necessary thereto. It would seem extremely technical to hold that the identical Senators and Representatives sitting as a constitutional convention under article 19 could by a majority of each House propose amendments, provide for submission of them to the people, and incur the expense thereof, and yet be compelled to dissolve as a convention and reconvene under article 4 to make an appropriation of money to pay the expense. In the case of constitutional conventions as commonly understood, the personnel of the delegates therein is usually different from that of the coexistent Legislature, but under the system whereby the Legislature is sitting as a convention to formulate and submit constitutional amendments, the personnel is the same. It may be that the acts of the Legislature-convention body partake of both Constitution making and law making in the narrow sense. But it is apparent that the body, whatever it may be called, could not even propose constitutional amendments under article 4, and that it could not pass laws which are outside the narrow range of Constitution making under the provisions of article 19. But it seems that the 2 capacities may converge within that narrow field.

A somewhat pertinent illustration is the passing of the complete separation of functions of law courts from equity courts. Law and equity principles persist, but they are administered by the same judge. He no longer is required to rise as a court of law and walk around his chair and sit down again as a chancellor. We think it is not unlikely that the acts of the Legislature, acting as a convention to frame and submit constitutional amendments, may partake of both Constitution making and legislation. But the answer to defendant's contention is that the acts of the Legislature against which a referendum may be directed for the purpose of approving, disapproving, suspending, or annulling the same are only such laws ("any laws") as may be enacted by the Legislature alone without the interposition of an approving vote of the people. In other words, the required number of electors may by petition under section 1 of article 4 suspend the operation of a law and refer its fate to the electors, but there

is nothing in said article which supports the view that such petitioners have the *right to refer* "the right to refer" a proposed constitutional amendment for their approval or disapproval.

The defendant relies further on Clements v. Hall, quoted supra, because of the statement there made that the Arizona enactment "adopts by reference a system of general laws, to wit, the general election laws, whether applicable or not." Defendant says in her brief:

"The bill in question not only adopts by section 2 the general law, as in the Arizona case (Clements v. Hall, supra) but it goes further and provides in section 3 for the method of appointment of election officials, and their pay. It goes into details as to the manner of purging registration lists."

It is an interesting speculation as to whether most all of the provisions of chapter 117 so referred to are not surplusage or in the main mere reaffirmance of a portion of the general election code enacted 10 years earlier specifically made applicable to elections on constitutional amendments.

Section 41-401, N.M.S.A.1929, is as follows:

"At all elections at which any proposed constitutional amendment or question other than the election of officers shall be submitted to a vote of the electors, such election shall be held and conducted in conformity with this act insofar as the same is applicable."

A further illustration will show how unfortunate it might be if defendant's views should prevail. Suppose the Legislature, pursuing its extra-legislative function of Constitution making, should submit constitutional amendments after the general appropriation bill had been passed by the Legislature and provide in the submission of such amendments that they shall be voted on at the next regular election, and make an appropriation to defray that part of the expenses of the election which will be incurred solely for the purpose of procuring election supplies such as ballots submitting the proposals, etc., not otherwise necessary for the holding of the general election, and suppose such appropriation enactment could be traced solely to the powers derived by the Legislature from article 4. Can it reasonably be claimed that the right to amend the Constitution so carefully preserved by a majority of the electors who adopted the Constitution could be thwarted by 25 per cent. of the electors under the legislative power reserved in the people by article 4? We think such was not the intention.

Plaintiff in his brief offers the following good illustration as to how defendant's theory would work on the power contained in section 2 of article 19, providing for constitutional conventions:

"If we adopt a homely test of the soundness of the respondent's theory that provisions '*by law*' for constitutional conventions, or for voting on proposed amendments at special elections, we believe we

could demonstrate the absurdity to which it leads. If the legislature of New Mexico in 1937 had submitted to the people, at the general election of 1938, the question of whether a constitutional convention should be called, it would become the duty of the *next* legislature, meeting in January, 1939, to give effect to the favorable vote of the people if they approved at the ballot box. Pursuant to Section 2 of Article 19, being the next legislature after the people had spoken at the ballot box, the legislature of 1939 would, of necessity, by bill provide the date, place and conditions under which the constitutional convention should be held and would, also, include the necessary directions as to how the special election should be conducted; what laws should govern it, and how the expenses thereof should be paid. According to the respondent, this would be an ordinary statute or law, subject to referendum. If the date set for the constitutional convention should be fixed by the legislature prior to the general election in 1940, a petition by twenty-five per cent of the voters would be sufficient to suspend the holding of the election for delegates to the constitutional convention, and then, if a majority of the people approved the law at the general election of 1940, the matter would reach a stalemate. The date for the election for delegates to the constitutional convention, as fixed by the legislature of 1939 in its bill calling the election, having passed there would be nothing to do but wait until the legislature of 1941 could meet and then to see what that legislature might be able to do. Manifestly it could do nothing, because it would not be the 'next legislature' after the people had voted in 1938 to approve of a constitutional convention. The legislature of 1939, having gone into history, and the legislature of 1941 having no power, we would have nothing to do but start again the vicious circle."

Again, section 5 of article 19, says:

"The provisions of section one of this article shall not be changed, altered, or abrogated in any manner *except through a general convention called to revise this constitution as herein provided."* (Italics ours.)

Section 1 contemplates that the Constitution may be amended at either a general or special election. Conceivably, if defendant's views should prevail, 25 per cent. of the electors under section 1 of article 4 could change, alter, or abrogate the provisions of section 1 of article 19 so as to limit the submission of constitutional amendments to the voters at general elections by the simple process of filing referendum petitions.

We will now consider the contentions of defendant that the alternative writ was improvidently issued and that the plaintiff is not a person with capacity to sue. We treat them together because the same principles touch each contention.

In State ex rel. Owen v. Van Stone, 17 N.M. 41, 121 P. 611, 613, we said:

"Under the provisions of sections 3 and 13 of article 6 of the Constitution, this court

and the district courts each has original jurisdiction in quo warranto and mandamus against all state officers, boards, and commissions in all cases, whether the proceeding be instituted by the Attorney General, ex officio, in behalf of the state for some prerogative purpose, or be brought by some private person for the assertion of some private right.

"This court, in the absence of some controlling necessity therefor, of the existence of which this court is sole judge in each instance, should decline such jurisdiction and will do so in all cases brought at the instance of a private suitor. What will be considered by this court as a controlling necessity, it would be impossible, and indeed improper, to attempt to define in advance."

From this it is argued by defendant that it was a declared policy that this court will not issue its prerogative writ of mandamus "at the instance of a private suitor." What is meant in State ex rel. Owen v. Van Stone is that this court "should decline such jurisdiction and will do so in all cases brought at the instance of a private suitor * * * for the assertion of some private right." The court took notice of considerations that exceptions exist where the case "is publici juris; that is, a case which affects the sovereignty of the state, its franchises or prerogatives, *or the liberties of its people.*" (Italics ours.)

From what we have heretofore said, it appears that the right of the people to amend their Constitution is in the interest of the public peace or safety and is one of the "blessings of liberty" for which our people in the preamble to their Constitution expressed gratitude to Almighty God.

In State ex rel. Burg v. City of Albuquerque, 31 N.M. 576, 249 P. 242, 246, an application was made by a citizen for a writ of mandamus against the city of Albuquerque, and its commissioners, to require the submission to a vote of the people of a certain city ordinance. The capacity of the plaintiff to maintain the action was challenged by the respondent, and in discussing the point involved we said:

"While there are exceptions, it is the general rule that mandamus may be issued to enforce the performance of a public duty by public officers, upon application of any citizen whose rights are affected in common with those of the public. Such person is 'beneficially interested' in the enforcement of the laws."

Defendant argues that this case is not applicable because there the plaintiff was the man who presented the petition for referendum election and therefore his right to vote depended upon the filing of the petition. But the same principle applies to the person who shows that his right to vote depends upon the submission of the proposed constitutional amendments as commanded by the people in their Constitution. Article 19 commands the Secretary of State to cause any amendment or amendments proposed by the Legislature to be published, etc., a very solemn mandate from a very high authority. The beneficial interest re-

posed in the plaintiff in the Burg Case and in the case at bar is the same, namely, the right to vote.

We do not agree with defendant that in Asplund v. Hannett, 31 N.M. 641, 249 P. 1074, 1075, 58 A.L.R. 573, we announced principles contrary to the holding in the Burg Case. There are a number of considerations mentioned in the Asplund Case to be borne in mind in considering whether the holding there is in conflict with the decision in the Burg Case. In the first place, Mr. Asplund sued to enjoin the Governor himself, the chief executive whose duty it is to act in more than a ministerial capacity in taking care that the laws be faithfully executed. Some difference might be traced to the fact that the respondent in the case at bar, occupying an office of great dignity and importance, has only ministerial duties to perform in respect to the matters herein involved. Mr. Asplund sued as a citizen and taxpayer. We saw no right which Mr. Asplund was seeking to vindicate except the private right to be relieved from a burden of additional illegal taxation, and we pointed out that his complaint did not state "what effect, if any, the proposed action will have, either to increase or decrease the taxes of the appellant, or of any taxpayer of the state"; and again we said:

"As already pointed out, it is not satisfactorily shown that appellant will be in any way injuriously affected in his property by the proposed expenditures. Perhaps his failure to show such injury should be deemed decisive. We prefer, however, to assume, *for the purposes of this case,* that the necessary result of the proposed use of the ' * * * fund,' will result in increasing state taxes." (Italics ours.)

Whatever may be the effect of the argument and declaration, it appears that the case could have been decided upon the proposition that it was not shown that the appellant was injuriously affected. And in Asplund v. Hannett a distinction is suggested between the jurisdiction of the Supreme Court in the exercise of its original jurisdiction and in the district court where injunction is sought to vindicate some private right. We referred to the decision of the Wisconsin Supreme Court in State ex rel. Lamb v. Cunningham, 83 Wis. 90, 53 N.W. 35, 17 L.R.A. 145, 35 Am.St.Rep. 27. We pointed out that in the Wisconsin case the question was publici juris and that the Wisconsin court reached the conclusion that mandamus and injunction were correlative writs with respect to their use by the Supreme Court in the exercise of its original jurisdiction. We said:

"The argument was that the design was to give the Supreme Court 'original jurisdiction of all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people.' That being the purpose, and injunction being one of the writs authorized for the purpose, it must be considered, when so sued, a quasi prerogative writ correlative with mandamus. But the court says it is firmly established that: 'In

matters strictly publici juris, in which no one citizen has any right or interest other than that which is common to citizens in general, a petition by a private person for leave to commence an action in this court in the name of the state cannot properly be considered until the Attorney General has been requested to move in the matter, and has refused or unreasonably delayed to do so.' "

The holding in the Cunningham Case was as follows:

"A state constitutional clause conferring upon the supreme court original jurisdiction to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and other original and remedial writs, is designed to give to that court original jurisdiction of all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people."

It is conceded in the case at bar that the Attorney General could not be expected, because of his position or affiliation and appearing as he does on behalf of respondent, to intervene in behalf of plaintiff in the case at bar or others similarly situated.

Section 105-113, N.M.S.A.1929, provides:

"When the question involved in a cause of action is one of common or general interest to many persons, or where the parties are numerous and it is impracticable to bring them all before the court one or more may sue or defend for the benefit of the whole number of persons so interested in said cause of action."

It is true, as we said in Asplund v. Hannett, neither this enactment nor the fact that the Attorney General refused or failed to act on behalf of plaintiff who asserts the vindication of a beneficial interest in the action or nonaction of a public officer, did not in that case create a cause of action. Still we think they are circumstances which aid the plaintiff in the case at bar. It must be apparent that the plaintiff does not claim that the exercise of his vote alone could result either in the approval or disapproval of the proposed constitutional amendments and that his right asserted is the same right which all of the electors are entitled to exercise.

Believing as we do that the plaintiff is a person "beneficially interested" in his own behalf and that the cause of action which he asserts is one of common or general interest to many persons, if it were deemed important to plaintiff's assertion of the right, we would deem his application to be amended so as to assert that he complains on behalf of himself and all other residents, citizens, and qualified electors, and that he brings his suit in the name of the state, the Attorney General not being circumstanced to sue in his behalf. See Kimberly v. Morris, 87 Tex. 637, 31 S.W. 808. As to the "controlling necessity" for the issuance of the writ, the allegations of the application heretofore quoted present a sufficient showing. We conclude that we are proceeding within our jurisdiction and discretion and that the plaintiff possesses capacity to maintain the action.

Defendant questions the constitutionality of chapter 117 of the Laws of 1937 involved herein, upon 2 grounds which we find it unnecessary to state. The defendant, as a public officer of the state not showing in her answer that she is either injured or jeopardized by the operation of the enactment and being a state official acting in a purely ministerial capacity, cannot be heard to question the constitutionality of such enactment. See State ex rel. Davidson v. Sedillo, 34 N.M. 1, 275 P. 765.

Another contention of the defendant somewhat similar to that last mentioned is thus stated in her brief:

"The purpose and effect of the matter contained in Joint Resolution No. 14, the so-called Constitutional Amendment No. 2, is solely to put into effect chapter 79 of the Laws of 1937, and is an unauthorized delegation of legislative power and in violation of the spirit and letter of article 9, section 8 of the State Constitution requiring the vote of the people at a general election to authorize bonded indebtedness in excess of One Hundred Thousand Dollars ($100,000.00)."

The proposed amendment is entitled "Constitutional Amendment No. 2," and in form at least is a proposed constitutional amendment. A contention similar to that here made by defendant was made in State ex rel. Marcolin v. Smith (1922) 105 Ohio St. 570, 138 N.E. 881, and was disposed of somewhat along the lines of the principle announced in State ex rel. Davidson v. Sedillo, supra. That was a per curiam opinion concurred in by Wanamaker, Robinson, Jones, Matthias, and Clark, Justices. Marshall, C. J., and Hough, J., dissented. Mr. Justice Wanamaker filed a concurring opinion reviewing extensively the authorities and from which we find it convenient to quote:

"The primary and paramount question in this case bared to the bone is this: Can the secretary of state, under the Constitution of Ohio, nullify or deny to the people their right of referendum on a proposed law, statutory or constitutional, upon the sole ground that the proposed law, if it shall receive a majority vote of the people and thus be adopted as a law, will be in conflict with some provision of the federal Constitution?"

Article 19, section 1, of our Constitution, after providing for the proposal by the Legislature of constitutional amendments, says:

"The secretary of state shall cause any such amendment or amendments to be published," etc.

Section 41-403, N.M.S.A.1929, being a portion of article 4 of chapter 41 of said compiled statutes, and what is known as "The 1927 Election Code," says:

"The secretary of state shall provide printed ballots for the use of electors in all cases where constitutional amendments or other questions to be submitted to the electors of the entire state are involved, and shall transmit the same to the county clerks, who shall deliver them to the elec-

tion officers as election supplies are delivered under the provisions of this act."

Section 41-404 makes it the duty of the Secretary of State, whenever a proposed constitutional amendment or other question is to be submitted to the electors of the state at large, to "certify the same to the county clerks." Said 1927 Election Code contains other directions to the Secretary of State.

We again quote from the opinion of Mr. Justice Wanamaker:

"I can imagine no more startling proposition to the sovereign people of Ohio, who in making our new Constitution in 1912 endeavored by amendments to generally enlarge their reserve powers and correspondingly limit the powers of their public servants, to discover 10 years after, as contended in the minority opinion, that, instead of having the right to alter and amend their own Constitution at will, that public will was at all times subject to the approval and consent of their own secretary of state.

"It is a novel doctrine, to say the least, that a public servant is greater than his master. Nineteen centuries ago it was written: 'Is the servant greater than his Lord?' The old doctrine that enumeration of certain duties excludes all others not enumerated is peculiarly applicable in this case. The Constitution itself specifies the duties that the secretary of state shall perform touching a proposed amendment, but nowhere is it suggested that he may pass on the ques-

tion of whether a proposed amendment to the state Constitution is or is not in conflict with any provision of the federal Constitution."

Again:

"If there be that clear conflict between the state Constitution and the federal Constitution, as claimed by the minority, may we not abundantly confide in the judgment and patriotism of the majority of the people to likewise see that clear conflict, and vote accordingly? I commend the following sentiment of Abraham Lincoln in one of his great addresses:

" 'Why should there not be a patient confidence in the ultimate justice of the people? Is there any better or equal hope in the world?'

"Suffice it to say, however, that the people themselves have reserved to themselves the right to pass upon this question by a referendum vote. If rejected by that vote, that is an end of the whole matter. If adopted by that vote, and anybody's rights under the federal Constitution are so affected as to present a judicial question, the matter of conflict will then be fairly and fully determined by the courts."

From the per curiam opinion we quote the following:

"It has thus become the established law of this state that no officer or tribunal may interfere either with the enactment of laws or the amendment of the Constitution while the same is in process, upon the ground that such legislation, if enacted, or constitutional amendment, if adopted, will be

in conflict with the Constitution, state or federal. These questions are and must necessarily be reserved for consideration and determination after the legislative or constitution-making body shall have fully performed its function and such new law or constitutional amendment shall have become effective."

We are in entire agreement with the foregoing principles announced by the Supreme Court of Ohio.

See, also, State ex rel. Cranmer v. Thorson, 9 S.D. 149, 68 N.W. 202, 33 L.R.A. 582, where the court held:

"Under Laws 1891, c. 57, § 12, providing that 'whenever any proposed constitution or constitutional amendment or other question is to be submitted to the people of the state for popular vote, the secretary of state shall * * * certify the same to the auditor of each county in the state,' it is the duty of the secretary to certify a question directed by the legislature as to whether a provision of the constitution shall be repealed, though an affirmative answer by the people would not affect the constitution."

The answer of the defendant, presenting no valid or legal reason for her failure or refusal to proclaim and call the special election and perform the duties enjoined on her in the Constitution and laws of New Mexico, the alternative writ of mandamus heretofore issued will be made permanent, and it is so ordered.

HUDSPETH, C. J., SADLER and BRICE, JJ., and NUMA C. FRENGER, District Judge, concur.