26 So.2d 849

**NORTON v. LUSK et al.**

**3 Div. 459.**

Supreme Court of Alabama.

June 20, 1946.

Marion Rushton, Richard T. Rives, Rushton, Stakely & Johnston, and Hill, Hill, Whiting & Rives, all of Montgomery, for appellant.

114

Wm. N. McQueen, Atty. Gen., Frank N. Savage, Asst. Atty. Gen., and R. E. Steiner, Jr., of Montgomery, for appellees.

Crampton, Harris and Harris & Brown, all of Birmingham, for appellee R.F.C.

Jas. A. Simpson, of Birmingham, for Alabama Medical Association, amicus curiae.

SIMPSON, Justice.

The bill of appellant is, in essence, to enjoin the payment of, to wit, $1,200,000 to the Reconstruction Finance Corporation (R.F.C.) for the discharge and in liquidation of the revenue anticipation bonds (all callable) encumbering Jefferson Hospital, Birmingham, Alabama, which hospital with its equipment and assets had been previously delivered by Jefferson County, the owner, to the Medical College of the University of Alabama under a written contract of purchase whereby the University assumed the County's obligation on the bonds.

Appellees rest authority for payment on Act No. 418, General Acts of Alabama 1945, page 660, approved July 7, 1945, and effective October 1, 1945, which reads:

"An Act to make an appropriation for the payment of outstanding debts of the State of Alabama or any of its agencies or institutions.

"Be it Enacted by the Legislature of Alabama:

"Section 1. A sum of money, which shall be equal to but not in excess of the proceeds of income tax collections remaining at the close of the fiscal year ending September 30, 1945, after all appropriations and prior charges against such funds for such fiscal year have been paid and a sufficient amount has been set aside to comply with all provisions of law with respect to the creation of funds for the payment of the oustanding 'Income Tax Bonds' and the 'Old Bonded Debt', is hereby appropriated out of the State treasury, to be released upon the approval of the Governor, for the payment of any outstanding debt of the State of Alabama or any of its. agencies or institutions.

"Section 2. This act shall become effective October 1, 1945.

"Approved July 7, 1945."

The bill avers that acting under authority of this Act, the Governor of Alabama approved the release of the stated sum for payment to the R.F.C. in satisfaction of said bonds and that the State Comptroller, Hon. John Graves, has issued or will presently issue a warrant drawn on Hon. Walter C. Lusk, Treasurer, for said amount payable to the R.F.C. for that purpose.

The precise question is whether or not Act No. 418, above, authorizes this character of payment from the appropriation therein named, as an outstanding debt of one of the State institutions, here the University of Alabama.

By its averments, the bill asserts the negative of the proposition, contending that such a disbursement of public funds would be unauthorized and illegal for the reasons: first, that Act No. 418 is not applicable to a situation as here disclosed because (a) the bonds were not a "debt" or "outstanding" against the University of Alabama on its effective date, (b) the Act was passed in anticipation of the adoption of the (defeated) Income Tax Amendment, (c) the Act did not comprehend authority

to so disburse any of the appropriation, power to deal with the specific matter having been previously irrevocably committed to the State Building Commission by Act No. 128, General Acts 1945, page 116, adopted June 16, 1945; and second, Act No. 418 violates §§ 72, 43, 44, 21, 71 and 45 of our State Constitution.

Before addressing discussion to the legal questions involved, it is necessary to refer to previous statutes dealing with the establishment and operation of the Medical College of Alabama and the relative bearing of these statutes on the consequences of the act now under consideration.

■ The Medical College of Alabama as an integral of the University of Alabama was created in 1943, General Acts 1943, page 89. On the Board of Trustees of the University was imposed the authority and duty of operating it according to the approved standards of the Council on Medical Education and Hospitals of the American Medical Association and of the Association of American Medical Colleges and to the Legislature was committed the matter of appropriating adequate funds for the program. A commission was created to locate the College and to establish, build and equip it at the best available place in accordance with the mentioned standards. This consequently carried with it the authority to acquire and set up a hospital in connection with the establishment of such Grade A Medical College. As stated, Jefferson Hospital was owned by Jefferson County and encumbered by the aforesaid bonds held by the R.F.C., the bonds being secured by the revenues from the Hospital's operation. So Birmingham in Jefferson County was selected as the location of the Medical College.

Thereafter on December 20, 1944, pursuant to the authority of the last named act, a written contract between Jefferson County and the University authorities was executed whereby Jefferson Hospital, including buildings, equipment, supplies, accounts receivable, bank accounts, bond accounts, and all other assets, was turned over to the Medical College, in consideration for which among other undertakings, the University assumed "all outstanding obliga-

tions which are rightfully chargeable against the operating costs," including of course the obligation existing under the R.F.C. bonds.

Act No. 80, Gen.Acts 1945, p. 77, approved June 9, 1945, presumably as an aid to the accomplishment of the contemplated program, was enacted authorizing the Board of Trustees of the University to acquire hospitals and to assume any revenue bonds thereon.

■ Then on June 16, 1945, an act was passed and approved by the same Legislature creating the state Building Commission (Act No. 128, page 116) with comprehensive authority to acquire property, construct and equip buildings, etc., for the State or any of its institutions or agencies. Section 5 embraced a prospective survey of a capital improvement program to be considered and undertaken by the Commission and listed the Medical College as one of the "deferable projects." It is noteworthy the R.F.C. bonds were described in this schedule as a "Debt on Jefferson Hospital Building." Subsection XIX, page 124. Thus it would seem that the Legislature signified the obligation which the University had assumed to be a "debt."

Reverting now to the legal propositions presented, we will give first consideration to the insistence that Act No. 418 cannot be applied to authorize disbursement of any of the appropriation to discharge the hospital bonds.

It has been argued with much force, both orally on submission of the cause and in brief, that the obligation under the bonds held by the R.F.C., which the University had assumed, could not be construed as a "debt" within the meaning of Act No. 418 and were not outstanding on the effective date thereof; that, therefore, to utilize any of the appropriation in discharge thereof would be unlawful.

### Debt.

Speaking now as to the meaning of the term, we note that "debt" has not "a fixed or invariable signification, but has several recognized meanings which vary greatly according to the subject matter and the language in connection with which the word is used. It is used in different statutes and

constitutions in senses varying from a very restricted to a very general one." 17 C.J. 1371, 1372, 26 C.J.S., Debt. page 1.

■ Section 213, Constitution, Amendment 26, prohibits the State from making a new debt. This requires, inter alia, the annual financial operations of the State to be on a balanced budget and prevents any department of the State from making a State debt. This cannot be done by any subterfuge as by appropriating money in excess of revenues, by expanding the functions of government, nor by enlarging the activities of its departments. Hall v. Blan, 227 Ala. 64, (13 and 14), 148 So. 601.

■ Nor can a fictitious corporation be given the power by the Legislature to create a debt to evade the requirements of said Section 213. In re Opinions of Justices, 225 Ala. 356, 143 So. 289; In re Opinions of the Justices, 227 Ala. 289, 149 So. 775.

But when a State corporation is set up to perform an important public purpose, it may be given the power to, and may, create a debt on its own account, without any liability or debt imposed on the State. Rogers v. Garlington, 234 Ala. 13, 173 So. 372; Long v. Alabama Highway Corp., 234 Ala. 142, 174 So. 41; Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 116 So. 695; Harman v. Alabama College, 235 Ala. 148, 177 So. 747; Keller v. State Board of Education, 236 Ala. 400, 183 So. 268.

The Constitution has also made a limitation on the amount of indebtedness which a county (§ 224) or a city (§ 225) may create.

■ This has been construed to apply not only to an obligation to which the county or city pledges its full faith and credit, called a general obligation, but also when the county or city pledges existing property or revenue from existing sources to be derived in the future. The rationale of these decisions is that such an arrangement would freeze funds or property already acquired, actually or potentially, and if a county or city could thus freeze a portion of its income, it might by different transactions freeze it all, and cripple its power to function as a governmental institution to the detriment of taxpayers. In re Opinions of the Justices, 226 Ala. 570, 148 So. 111;

Town of Opp v. Donaldson, 230 Ala. 689, 163 So. 332; Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859; Fuller v. City of Cullman, 240 Ala. 309, 199 So. 2; Chamberlain v. Board of Commissioners of City of Mobile, 243 Ala. 662, 11 So.2d 724; Wharton v. Knight, 241 Ala. 218, 2 So.2d 310; Patterson v. Jefferson County, 238 Ala. 442, 191 So. 681. The full faith and credit of the county or city is not thereby pledged, but a part of it is pledged.

■ Under these authorities and others, however, the county or city does not pledge its faith or credit when the indebtedness incurred to purchase or develop new property or facilities is made repayable solely out of the income to be derived from such property or facilities. We have said that such an obligation by a county or city does not create a debt within the meaning of §§ 224 or 225. Those provisions of the Constitution were intended to limit the burden imposed upon taxpayers by new obligations, and to stabilize the economic position of the institution.

But whether a given status or obligation is a debt under the Constitution so restricting the institution has relation to the purpose to be accomplished. It may not be a debt such as is contractable as an absolute obligation .to pay, pledging the faith and credit of the State, or the institution, yet nevertheless could be a debt in a sense that it is an obligation due from the institution to the payee to see that the transaction is executed according to agreement. "Debt" is defined as: "That which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another or to perform for his benefit; thing owed; an obligation or a liability." Webster's New International Dictionary, Second Edition.

■ And in enacting Act No. 418, supra, we do not think the Legislature had in mind a constitutional debt within the limitations we have mentioned.

We held in Harman v. Alabama College, supra, that those constitutional limitations did not affect a State college incorporated as a State institution, except that it could not make a State debt. But it could make a debt for itself, though it could not be sub-

ject to a personal judgment; that it did make a debt by pledging future income to be derived from existing sources; but not by pledging future income from property to be acquired in the future for funds with which to acquire such property. But in saying that a county or city, or public corporation, did not incur a debt by pledging income to be derived from new property to pay for such property, we were dealing with the constitutional restrictions referred to, and such debts as there contemplated.

When, though, the Legislature authorized the Governor to use an appropriation to pay debts of a State institution, we do not think the Legislature meant to restrict the appropriation to such debts as would be so classified under the restrictive clauses of the Constitution.

■ The status of the University toward this property resembles that of a purchaser of property on which there is an outstanding mortgage, but without assuming the mortgage, buying only the equity of redemption, but obligating itself to comply with its requirements as to applying to its payment income to be derived from the operation of the property.

It is said in Thomas v. St. Paul's M. E. Church, 86 Ala. 138, 141, 5 So. 508, 510, that "when a mortgagor conveys the mortgaged premises subject to the mortgage, he only conveys the equity of redemption; and the discharge of the mortgage, which, in such case, is *the equitable duty of the grantee,* is preliminary and requisite to the acquisition of an interest by him. Founded on this reasoning, it has been repeatedly held that the effect of the transaction in equity was to make the mortgaged premises the primary fund for the payment of the debt, and to place the mortgagor in the situation or relation of a surety—to change his position from that of principal and only debtor, as created by the original contract, to that of guarantor." (Emphasis supplied.) So that though the grantee does not become personally bound to pay the debt "[he] became * * * interested in its payment" (Toney v. Dewey, 201 Ala. 533, 78 So. 887, 888), and he assumes some of the attributes of a debtor if he is to retain the property which he has bought. As between him-

self and the mortgagor, the latter owes no duty to pay, and if he does he "is entitled, as against the grantee, to all the rights of a surety, * * * to the extent of the value of the property." Thomas v. St. Paul's M. E. Church, supra. The grantee has bought the equity of redemption, and to retain it must pay the debt and there is no other person bound by obligation to him to pay it. His property is the primary fund. His necessities in that respect are akin in some respects· to those of a person who has pledged his credit to pay it. His credit is pledged for a limited purpose. It would not be a contradiction in terms and seems logical to hold that he may be included in the category for some purposes as a debtor.

Here the situation of the University is even more persuasive to this conclusion. In this instance the University assumed a personal obligation to use the property so that the income will be applied on the bonded debt (a liability first assumed by Jefferson County) and in this respect assumed the liability thereunder. That liability does not extend to an absolute obligation for the payment of the debt in full, but does impose an obligation, and to free the property from the mortgage the University must either pay the debt with other funds or go through the slow process of applying the income from it to that purpose. Either aspect embraces attributes of a debtor.

In some of the above noted cases this court has characterized such obligations as "debts" and when the Legislature used the word "debt" in Act No. 418, we are not impressed that it was intended to be confined to a situation where the State institution pledged its full faith and credit, but includes a situation where it has purchased the equity of redemption in property creating the necessity and "the equitable duty" to discharge the mortgage, in order to hold on to the fruits of its purchase.

To adopt the construction sought by the bill, that the Act only applied to payment of constitutional or full faith and credit debts, would indeed leave to the Act a minuscule and sterile field of operation. If it was not intended to cover revenue bonds and such

indebtednesses of State institutions or agencies, then such institutions or agencies would be largely precluded from its operation. The remaining field of operation then would be in the main for the payment of the State's constitutional debts and it is not conceivable that the Legislature would have enacted to appropriate the small sum of approximately $2,200,000 to pay such debts so prodigiously greater than the appropriation.

■ In composing a correct connotation, the problem is not to construct a technical definition, but to ascertain the meaning intended by the Legislature. "The intention of the lawmaker constitutes the law." Cocciola v. Wood-Dickerson Supply Co., 136 Ala. 532, 537, 33 So. 856, 857.

We are fortified in our interpretation by the fact that the same Legislature in another act, No. 128, approved June 16, 1945, Acts 1945, page 116, noted supra, made reference to this identical bond issue as a "Debt on Jefferson Hospital Building," Subsection XIX, § 5 page 124. Act No. 418 was passed later, to wit, July 7, 1945, and stipulated for payment of debts of a State institution, at which time the University had made a contract with the County for the purchase of this hospital. If it was a "debt" on June 16, 1945, when so designated and described by the Legislature in that Act, it was so understood in Act No. 418, approved July 7, 1945, and the Legislature must have used the term advisedly.

### Outstanding.

■ When the Legislature passes an act applicable to all cities of a certain population according to "the last federal census," it is generally held that this means a status not limited to a date prior to the passage of the act but refers to the last census before the question becomes pertinent. Such is the principle of construction applied in the cases of State ex rel. Hyland v. Baumhauer, 244 Ala. 71, 12 So.2d 342, and Mitchell v. City of Gadsden, 145 Ala. 132, 40 So. 350, and the authorities there cited illustrate the generality of its application. We will not, however, apply the principle here.

■ This act appropriates a sum of money fixed by conditions which must exist September 30, 1945, the end of the State's fiscal year. This seems to indicate a purpose to fix that as the last day on which the debt to be paid could be regarded as outstanding, although the Act was approved July 7, 1945. October 1, 1945, is the effective date of its operation. This emphasizes a legislative purpose in that connection. A debt payable under the Act, we think, must have been outstanding at the furthest by October 1, 1945, and the appropriation can only be paid out of money in the State treasury subject to payment on September 30, 1945. Amended § 213, Constitution, Amend. 26.

■ As previously recited, on December 20, 1944, the University under authority of the Act of June 2, 1943, Acts 1943, page 89, entered into a contract for the purchase of the hospital from the County, which it agreed to sell. The University assumed all outstanding liabilities of said Hospital chargeable against operating cost, including this bonded debt Jefferson County had placed on it when it was constructed. It was also provided that the conveyance of title and the assumption of that indebtedness was subject to approval of the bond holder (R.F.C.). On April 23, 1945, the Board of Trustees validated the transfer of possession of the Hospital to the University, and reaffirmed its contract of December 20, 1944.

Though the R.F.C. (holder of the bonds) has never approved (nor disapproved) the transfer, the bill does not allege that it refused to approve it or would not accept the State's payment in full of the amount of the indebtedness which the Governor was proceeding to make under the Act No. 418, supra, when stopped by this proceeding. We presume therefore that the R.F.C. would accept full payment of it as contemplated by the Governor, and, indeed, exhibits to the bill seem to indicate that the bonded debt may be paid before maturity.

The University is in possession under its purchase, and the bonds would have been paid but for this proceeding. The University was bound as a purchaser to pay the purchase price, which was to assume cer-

tain burdens of the County, ultimately involving full payment of the bonds out of the Hospital revenues. Discharge of the bonds was planned to be paid forthwith, so that no approval by R.F.C. would have been necessary. The University was bound on December 20, 1944, subject to the approval of the R.F.C., which approval was necessary only if the cash was not paid. But under authority of Act No. 418, it was so arranged to pay the cash and, therefore, the absence of approval by the R.F.C. should not be considered as an impediment in the way of declaring that the whole situation created an outstanding debt such as contemplated by that Act. The occurrences up to that time created a status which did not prevent it from being such in an equitable sense, made in good faith, not as a subterfuge to make it seem so, merely to create what would appear to be sufficient to qualify under the Act.

"Outstanding" is defined by Webster's New International Dictionary, Second Edition, as "undischarged; uncollected or unpaid; unsettled; undetermined" and by Black's Law Dictionary, Third Edition, as "remaining undischarged; unpaid, uncollected; as an outstanding debt."

The agreement of December 20, 1944, in existence and still prevailing on October 1, 1945, was a very real and important transaction, the perfect good faith of which is not questioned. The obligation, still undischarged, had been assumed by the University at the time of the passage of the Act and the date of its effective operation. If it could ever become a debt, it was then so in a very real sense. The approval of the R.F.C. was but a condition subsequent, in respect to which the parties had bound themselves. The obligation continued unless that condition served to cancel it. This was to be rendered unnecessary of occurrence by this very proposal to pay R.F.C. all cash. It was, therefore, "outstanding" as of September 30, 1945.

Some question is raised of the authority of the University to assume the liabilities under the contract of December 20, 1944.

■ If Act No. 418 authorizes the payment of this character of obligation, as we have demonstrated it does, then there can be no doubt of the authority of the University to assume such a debt, to be implied from the 1943 Act creating the Medical College. We deduce this from the fact that the College properties, equipment, plants, etc., could only be acquired by the University by outright purchase in cash, or on credit, as by issuing its own bonds or indentures, or by purchasing encumbered property subject to the encumbrance.

The appropriation in the 1943 Act creating the College was manifestly insignificant and inadequate to accomplish the ends desired, but comprehensive authority was given therein to the Commission to acquire and the Board of Trustees of the University to maintain and operate the College in accordance with approved regional and national standards. See also Code 1940, Title 52, § 486 et seq., for general powers of the University and Board of Trustees. In connection with these statutory provisions we see no sound reason why the Hospital enterprise should not be regarded as a necessary part and reasonably incidental to the main purpose.

In view of the general over-all plan and purpose, as indicated in the course of the several enactments, to have established a Medical College of the University of Alabama and the delegation to the authorities named in the several acts to accomplish this end, we think it sound to hold that the University was within its authority in assuming, by the contract of December 20, 1944, Jefferson County's liability under the R.F.C. bonds. For analogy see Long v. Board of Trustees of Ohio State University, 24 Ohio App. 261, 157 N.E. 395.

Income Tax Amendment.

Inapplicability of the law is also rested on the claim that it was one of the several acts passed by the Legislature anticipatory to and dependent on the adoption of the proposed income tax amendment, which was later defeated.

■ This we think is completely negated by a reference to other acts of the Legislature predicated on this event, in each of which is embodied a specific clause conditioning its effectiveness upon the ratification of the amendment. See General Acts 1945, pages 85, 107, 108, 162, 195, 199. By

omitting the conditioning clause from Act No. 418 and no indication to the contrary otherwise appearing therein, the reasonable conclusion would be that the Legislature had no such intention, as advanced by this argument, and that this Act was unrelated to the proposed amendment. Such seems to be the clear meaning and the other, left to inference, cannot prevail. City of Birmingham v. Southern Express Co., 164 Ala. 529, 51 So. 159.

### The Building Commission Act.

Finally, on the question of the applicability of Act No. 418 to the matter involved and authority to so utilize a part of the appropriation, it is argued that the Legislature had so specifically dealt with the subject in the Building Commission Act (No. 128, page 116) as to exclude the Hospital project from the benefits of No. 418 because the "Debt on Jefferson Hospital Building" was listed in the Finance Department's survey embodied in Section 5 as one of the "deferable projects."

This is tantamount to assuming that the same Legislature which had already indicated the purpose to establish such College at the same time intended to defer indefinitely the inauguration of this necessary and very important adjunct to it. This appears to us to be a no more reasonable canonical construction than to assume that the later Building Commission Act (June, 1945), by creating such Commission, intended to supersede and abrogate the authority of the Medical College Commission (Act of 1943) to deal with the subject.

It should be noted that Act No. 128 made its own appropriation and gave direction as to its use. Act No. 418 made another and different appropriation independent of No. 128. The priorities, vel non, in No. 128, therefore, could not be considered as controlling the later Act.

This tabulation of a capital improvement program appears to mean what it says, a survey, and apparently was included as a recommendation of the Legislature to the Building Commission, with discretion as to its execution finally reposed in the Commission.

However, whatever the meaning or import of the so-called survey may be, listing this debt or other projects as deferred, in our opinion, does not warrant the construction that the Legislature had thereby intended to abdicate its prerogative to later deal with them and make appropriations accordingly. In view of the history of the legislative efforts purposed to establish the Medical College, as indicated in the other legislation, we are unwilling to narrow the holding to the limits contended for by this argument.

### Constitutionality.

The second aspect of the case challenges the validity of the Act as trenching on §§ 72, 43, 44, 21, 45 and 71 of our Constitution.

Before specific discussion, it should be kept in mind that all power to legislate, within constitutional bounds, is in the Legislature and the courts are reluctant to exercise the inherent power to strike down an act, as unconstitutional, and will not do so unless so convinced beyond a reasonable doubt, after indulging every presumption in favor of validity. Where susceptible of two interpretations, one constitutional and the other unconstitutional, it is the duty of the courts to uphold rather than nullify. These principles are so uniformly recorded in the jurisprudence of our country as to need no citation of authority.

Pertinent also is the principle that "the uniform legislative interpretation of doubtful constitutional provisions, running through many years, is of weighty consideration with the courts. Ex parte Hardy, 68 Ala. 303; Moog v. Randolph, 77 Ala. 597, 602; Farrior v. N. E. M. Security Co., 88 Ala. 275, 279, 7 So. 200; Jones v. McDade, 200 Ala. 230, 75 So. 988." Parke v. Bradley, 204 Ala. 455, 459, 86 So. 28, 32.

Likewise, "a construction not emanating from judicial decision, but adopted by the legislative or executive departments of the state and, moreover, long accepted by the various agencies of government and the people, will usually be accepted as correct by the judicial department." 11 Am.Jur. 697, § 78.

122

With these well recognized fundamental principles, already irrevocably embodied in the law, as constructional guides, we shall attempt to demonstrate the validity of Act No. 418.

### Delegation of Power

It is said that the Act violates §§ 72, 42 and 43 of the State Constitution as abdicating legislative power and delegating authority to the executive to determine the payee, the amount and kind of debt to be paid and without setting up a proper standard for such determination.

This argument would be well founded if addressed to a consideration of other state constitutions (notably, Illinois, Smith-Hurd Stats. § 16, Article 5, and Oklahoma, § 55, Article 5) which require more detailed enactment, and the designation of specific beneficiaries, amounts, etc. For general discussion, see 59 C.J. 250, § 390. Our Constitution (§ 72) only requires that "no money shall be paid out of the treasury except upon appropriations made by law" and provides for the triumvirate system and against the invasion or usurpation of one magistracy by the other (§§ 42 and 43), but it is no objection on this account that a specific beneficiary or the amount of the appropriation be not named or designated so long as a proper standard for ascertaining them is set up.

When the amount necessary for a certain purpose for which an appropriation is made is not named, our court has long held that it is no objection on constitutional grounds. State ex rel. Turner v. Henderson, 199 Ala. 244, 74 So. 344, L.R.A.1917F, 770; In re Opinion of the Justices, 237 Ala. 377, 186 So. 731(5); In re Opinion of the Justices, 234 Ala. 555, 176 So. 367.

Nor is the legislation objectionable under these provisions because the duty of allocating the appropriation is imposed on a board, commission or other agent, dependent upon a finding of facts and deducing conclusions within the standards fixed by the Act making the appropriation. Hawkins v. State Board of Adjustment, 242 Ala. 547, 7 So.2d 775; Calhoun County v. Brandon, 237 Ala. 537,

187 So. 868; Ballenger Construction Co. v. State Board of Adjustment, 234 Ala. 377, 175 So. 387; In re Opinion of the Justices, 234 Ala. 555, 176 So. 367; Opinion of the Justices, 244 Ala. 386, 13 So.2d 674.

We are unable to accord with the argument of able counsel so earnestly urged upon us that these sections of our Constitution have . been transgressed. The amount of the appropriation in the challenged Act is readily ascertainable (we are advised by the bill [Exhibit D] the amount was $2,219,977.12), and it is to be paid out under the directions of a proper agency for the public benefits stipulated therein. Opinion of the Justices, 244 Ala. 386, 13 So.2d 674; Ballenger Construction Co. v. State Board of Adjustment, supra, and cases cited. In view of our traditional legislative policy in enactments of this general character running throughout the course of our history with uniform court approval; the instant Act must be held to be free of these constitutional infringements.

This court in the case of Porter Coal Co. v. Davis, 231 Ala. 359, 362, 165 So. 93, in discussing the proposition, took occasion to notice approval of a statement by the United States Supreme Court, which we reassert as appropriate here: The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside of the halls of legislation. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 484, 55 L.Ed. 563; Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789; Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294.

In aid of our study, we have made recourse to various unchallenged appropriation acts of similar structure beginning with the Constitution of 1875, and some

are cited in the footnote, as bearing on the constitutional tradition and legislative and administrative policy of the State. State ex rel. Turner v. Henderson, supra, 199 Ala. at page 249, 74 So. 344; Parke v. Bradley, supra, 204 Ala. at page 459, 86 So. 28; 11 Am.Jur. 679.*

§ 21, Constitution.

While this section does provide "that no power of suspending laws shall be exercised except by the legislature," Act No. 418 is in no wise violative of this constitutional proscription. It is no offense that the Act is deferred in its operation until October 1, 1945 (Dearborn v. Johnson, 234 Ala. 84(15), 173 So. 864), nor that it delegates to the Governor the authority to draw on the appropriation after that date idem; Porter Coal Co. v. Davis, supra, and cases cited; see also Whaley v. State, 168 Ala. 152, 52 So. 941, 30 L.R. A.,N.S., 499, nor for any other reason visible to us.

§§ 71 and 45, Constitution.

The presently pertinent provision of § 71 is, "all other appropriations (except general appropriation bills) shall be made by separate bills, each embracing but one subject," and of § 45 is, "each law shall contain but one subject, which shall be clearly expressed in its title, except general appropriation bills," etc. It is contended that the considered Act ignores these constitutional mandates.

It is to be first observed that the subject may be expressed in general terms and when so everything subsumed under the general thought to make it a complete act, if cognate and germane thereto, is regarded as included in and authorized by it. Dearborn v. Johnson, supra; Allman v. City of Mobile, 162 Ala. 226, 50 So. 238.

But one subject is the requirement, and the form in which it is expressed is left to "legislative discretion." This prescription of the Constitution is satisfied if the Act has but one general subject which is fairly disclosed by its title. Ballentyne v. Wickersham, 75 Ala. 533; Lee v. City of Decatur, 233 Ala. 411, 172 So. 284; Board of Revenue v. Kayser, 205 Ala. 289, 88 So. 19; Johnson v. Robinson, 238 Ala. 568, 192 So. 412; Fuqua v. City of Mobile, 219 Ala. 1, 121 So. 696.

The Act clearly contains but one subject, namely, the payment of debts (of the beneficiaries designated) and, in respect to compliance with § 45, its title is sufficiently informative and indeed, aside from omitting the method of determining the appropriation and except for the limitation that the Governor must approve the payment, is texturally co-equal with and in substance as the body of the Act.

It is our conclusion that the Act is infractory of neither of these sections of the Constitution.

Conclusion.

Each member of the court has given studious and painstaking consideration to the propositions so ably presented by counsel. In fine, however, the court after deliberate consultation has concluded the Act is subject to none of the legal impediments advanced by the argument.

If this type of legislation be potential of the dangers suggested by its critics, correction must be addressed elsewhere, since it complies with all the constitutional requirements and legal sanctions long approved by the courts. "The answer, sufficient for us, is that the responsibility therefor rests upon the Legislature, not upon the court." State ex rel. Turner v. Henderson, supra, 199 Ala. at page 249, 74 So. 346.

The decree of the trial court was in conformity with the views hereinabove expressed and conclusions reached, and is affirmed.

Affirmed.

All the Justices concur except LAWSON, J., not sitting.

---

* Acts of Alabama: 1874–75, p. 117; 1875–76, p. 117; 1876–77, p. 30; 1878–79, p. 30; 1880–81, p. 17; 1882–83, p. 29; 1884–85, p. 77; 1886–87, p. 38; 1888–89, p. 25; 1890–91, p. 95; 1892–93, p. 184; 1894–95, p. 149; 1896–97, p. 140; 1900–01, p. 64 and p. 101; etc. to Acts 1945, No. 145, see items pp. 168(7), 169(7), 170(10), 172(1), 174(2); Code 1940, Title 55, § 105, and Acts 1945, p. 178(12).