Ernest Griffin Moore, Jr., and Sue L. Moore v. Commissioner.
Moore v. Commissioner
Docket No. 6421-70 SC.
United States Tax Court
T.C. Memo 1971-314; 1971 Tax Ct. Memo LEXIS 18; 30 T.C.M. (CCH) 1347; T.C.M. (RIA) 71314; December 15, 1971, Filed. Jack Keyes, 720 No. 18th, Bessemer, Ala., for the petitioners. Richard D. Hall, for the respondent. CALDWELL
Memorandum Findings of Fact and Opinion CALDWELL, Commissioner: The respondent determined deficiencies in *19 the petitioners' income taxes for the years 1967 and 1968, in the respective amounts of $348.13 and $480.31. There was only one adjustment for each year, and it presents the sole issue for decision: whether a portion of the amounts paid to the petitioner as a resident physician is excludable from income as a scholarship or as a fellowship grant, pursuant to section 117(a) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein and attached thereto, is incorporated herein by reference. Petitioners, at the time of filing their petition in this case, resided in Bessemer, Alabama. Their Federal income tax returns for the years 1967 and 1968 were filed with the Internal Revenue Service Center, at Chamblee, Georgia. The term "petitioner," in the singular, will hereinafter refer to the husband-petitioner, Ernest Griffin Moore, Jr. Petitioner is a physician. He graduated in 1966 from the Medical College of the University of Alabama in Birmingham, with the degree of doctor of medicine. During the year June 1966-June 1967, he served as an intern at the Carraway *20 Methodist Hospital in Birmingham. Upon the completion of his internship, petitioner was licensed to practice medicine in Alabama, and he could have begun practice in the state at that time as a general practitioner, fully empowered under Alabama law to engage in all forms of medicine and surgery for which he felt himself competent. Instead of entering a general practice, petitioner determined that he preferred to become a specialist in obstetrics and gynecology (hereinafter sometimes called "OB-GYN"). To that end, sometime prior to July 1, 1967, petitioner made application for a three-year residency in OB-GYN, at the University Hospital in Birmingham. The hospital is administratively a part of the University Hospitals and Clinics, one of the components of a 1348 larger whole, the Medical Center of the University of Alabama in Birmingham. Another component of the Medical Center is the Medical College of the University of Alabama in Birmingham. The University Hospital and the Medical College are separate and distinct from each other. [1]
*21 Petitioner was in turn duly accepted in the OB-GYN residency program and entered upon his duties as a first year resident on July 1, 1967. From that date through June 30, 1968, petitioner served his first year, and from July 1, 1968, through June 30, 1969, he served his second year of residency. The agreement which petitioner made with the University Hospitals and Clinics with respect to the residency program did not embrace the three full years required of him; rather it was for the first year only, and it was renewed for the second year and thereafter for the third year. Petitioner completed his residency in June 1970, and he was awarded a certificate stating that he had "satisfactorily completed the term of service as Resident in Obstetrics-Gynecology in the University Hospital." Completion of his residency entitled petitioner to take, and he thereafter took and passed, a written examination conducted by the American Board of Obstetrics and Gynecology, which rendered petitioner "Board eligible." Sometime in 1971, when he shall have taken and passed an oral examination, dealing with the cases of patients which he has attended, petitioner will receive a plaque certificate from the *22 Board that he is fully qualified in the medical specialty of obstetrics and gynecology. The University Hospital is more clinically oriented than research oriented, and accordingly petitioner and the other OB-GYN residents derived most of their training through attending patients, rather than in a classroom or laboratory setting. The University had a total of nine residents assigned to the OB-GYN ward at all times: three first year residents, three second year residents, and three third year residents. First year residents and second year residents divided their time between obstetrics and gynecology. As regards the obstetrics phase, all first year residents examined and approved interns' and students' work-ups on patients and made appropriate notes on every patient presenting complications; notified the junior and/or senior resident of the admission of a patient with complications, or whenever a major complication arose in the course of a patient's hospitalization; delivered most primigravid (first pregnancy) patients and obtained experience in the use of low forceps, conduction anesthesia, clinical pelvimetry, and in the evaluation of obstetrical judgment; instructed interns in *23 the use of low forceps and were present with interns whenever forceps were used; assisted the senior resident on Cesarean Section and other operative procedures; made daily ward rounds with the attending obstetrician; made daily post-partum rounds, morning and afternoon, and discharged patients who did not have complications; signed birth certificates on those infants born while they were on duty; attended all ante-partum clinics at the hospital and, if directed by the senior resident, Public Health ante-partum clinics; and rotated with other residents on emergency clinic service for OB-GYN patients. In addition to the foregoing clinical aspects of his training, a first year resident attended a weekly chart conference with the Chief of Service; the OB-GYN Journal Club, conducted weekly by each resident in turn; a weekly seminar conducted by members of various departments; a weekly OB-GYN Pathology Conference, conducted by the Department of Pathology; the monthly staff meeting of the OB-GYN Service; and a weekly perinatal conference, attended by all residents of the Obstetrics and Pediatrics Department, as well as by members of the teaching staff from each of those departments. As *24 regards the gynecology phase, a first year resident's duties and responsibilities 1349 were similar in nature and character to those outlined above for the obstetrics phase. The nature and character of both phases for second year residents paralleled those of the first year, the principal differences being that the residents were exposed, to a greater extent, to patients manifesting complications, and they were accorded more individual responsibility. [2]
The OB-GYN ward at the hospital contained 36 beds. The patients were all indigent persons who paid no fees to the hospital for the services which they received. There were 250 to 300 infants delivered each month. During *25 the three years of petitioner's residency he either delivered or participated in the delivery of between two and three thousand infants. Petitioner and the other OB-GYN residents were on call 24 hours per day. In actual practice, those residents followed a practice of working 36 hours, and then being off for 12 hours. During their 36-hour stints, they would take short naps, especially in the evening, whenever there were opportunities to do so. All residents at the University Hospital were compensated by year of residency, so that all first year residents were paid the same amount, all second year residents the same, and all third year the same. Also, during the calendar years 1967 and 1968, residents at the University Hospital were provided the following fringe benefits: uniforms and laundering of uniforms, breakfast and lunch; and two weeks' paid vacation. During his first year of residency, petitioner was paid $525 per month; and during his second year, he received $650 per month. Those amounts were fixed unilaterally by the hospital, and they were not geared to the peculiar or particular needs of the petitioner. The amounts thus paid were fixed by the hospital at a level to *26 provide subsistence for residents in general, together with their families. The hospital withheld Federal income taxes and social security taxes from the amounts paid to petitioner in each of the years here involved. On their Federal income tax return for 1967, petitioner reported $3,150 received from the University Hospital as income, and deducted $1,800 of that amount as a fellowship grant. For 1968, the amount reported as income was $6,945, and the amount deducted as a fellowship grant was $2,400. [3]
In his statutory notice of deficiency, the respondent determined that the amounts so deducted, were compensation for services and were not excludable from gross income under section 117 of the 1954 Code. Opinion The issue, as before stated, is whether $1,800 and $2,400 of the amounts paid to petitioner, Dr. Ernest Moore, by the University Hospital of the Medical Center of the University of Alabama in Birmingham, who served as a resident physician in obstetrics and gynecology at the hospital *27 during the taxable years involved, is excludable from income under and by virtue of the provisions of section 117 of the 1954 Code, as a scholarship and fellowship grant. Respondent contends that the amounts in dispute were compensation paid to petitioner for services rendered, and therefore that they are fully taxable as income under section 61 of the Code. At the threshold, we note that although petitioner treated the amounts in question as a deduction from income on their returns, both parties now agree that the question presented for decision to the Court is whether those amounts represent exclusions from income. The here relevant provisions of section 117 are as follows: Section 117. Scholarships and Fellowship Grants (a) General Rule. - In the case of an individual, gross income does not include - (1) Any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, including the value of contributed services and accommodations * * * 1350 (b) Limitations. - (1) Individuals who are candidates for degrees. - In the case of an individual who is a candidate for a degree at an educational *28 institution (as defined in section 151(e) (4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarship or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment. (2) Individuals who are not candidates for degrees. - In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B). (A) Condition for inclusion. - The grantor of the scholarship or fellowship grant is - * * * (iv) The United States, or an instrumentality or agency thereof, or a State, a territory, or a possession of the United States, or any political subdivision thereof, or the District *29 of Columbia. (B) Extent of exclusion. - The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, * * * The primary thrust of petitioner's case is that he was a candidate for a degree at an educational institution, and that the services which he performed were required of all of the OB-GYN residents as a condition to receiving their degrees; that such services are not to be regarded as "part-time employment"; and consequently that the amounts received by petitioner were a scholarship or fellowship excludable up to the amounts fixed by 117(b)(2)(B). On the basis of a careful consideration of the record, and of counsel's arduous efforts to support petitioner's petition, we are constrained to state that petitioner's position is without merit. Section 151(e)(4) of the Code defines an "educational institution" as "only an educational institution which normally maintains a regular faculty and curriculum and normally has a regularly organized body of students *30 in attendance at the place where its educational activities are carried on." The regulations promulgated under section 117 contain certain provisions relevant to disposition of the issue in this case, as follows: Section 1.117-3 Definitions - (a) Scholarship. A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies. * * * (c) Fellowship grant. A fellowship grant generally means an amount paid, or allowed to, as for the benefit of, an individual to aid him in the pursuit of study or research. * * * (e) Candidate for a degree. The term "candidate for a degree" means an individual, whether an undergraduate or a graduate, who is pursuing studies or conducting research to meet the requirements for an academic or professional degree conferred by colleges or universities. It is not essential that such study or research be conducted at an educational institution which confers such degress if the purpose thereof is to meet the requirements for a degree of a college or university which does confer such degrees. * * * Sec. 1.117-4 Items not considered as scholarships *31 or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of Sec. 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents 1351 either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. * * * However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. * * * In the recent case of Bingler v. Johnson, 394 U.S. 741, *32 the Supreme Court had before it Sec. 1.117-4(c) of the Regulations, and the Court sustained their validity. The Court there stated the "ordinary understanding of 'scholarship' and 'fellowship,'" to be "relatively distinterested, 'no-string' educational grants, with no requirements of any substantial quid pro quo from the recipients." (394 U.S., at 751). Whether petitioner be considered to be a candidate for a degree from an educational institution or not - and we are not persuaded that he was - he cannot prevail in this case, if the amounts which he received were compensation for past, present, or future employment services for the University Hospital. We are convinced that petitioner received those amounts for the significant services which he performed for the hospital in delivering infants in the obstetrics phase of his residency, and caring for the gynecological needs of the patients of the hospital in the gynecology phase. We could not and do not say that petitioner did not receive valuable training and experience, which will be extremely useful to him, in the practice of his professional speciality of obstetrics and gynecology. Still, as we said in Aloysuis J. Proskey, 51 T.C. 918, 925: *33 virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a non-taxable fellowship grant, merely because the recipient is learning a trade, business or profession. Whatever training petitioner received during the years of his residency - and we do not deny that it was substantial - was merely "incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely, the care of its patients." In sum, we think that petitioner gave University Hospital a substantial quid in the form of his services, for the Hospital's quo, in the form of its payments to him. We decide the case for the respondent, and hold that petitioner is not entitled to exclude from income any of the amounts which he received from the University Hospital in 1967 and 1968. Aloysuis J. Proskey, supra; Frederick Fisher, 56 T.C. 1201. Reviewed and adopted as the report of the Small Tax Case Division. Decision will be entered for respondent. Footnotes
1. Upon inquiry by the Court, counsel for the parties have advised the Court that the only statutory provision in the Alabama Code giving authority for the operation of the University Hospital is Title 26A, Sec. 509(10), which provides in here relevant part as follows: "The board of trustees of the University of Alabama shall have full power and authority to acquire, by purchase, lease, or gift, from any city, county or other public or private body, and to maintain, utilize, and operate any personal or real property, whether in the form of hospitals, clinics, or otherwise, deemed to be appropriate and necessary to the maintenance and operation of its school of medicine." In the case of Norton v. Lusk, 248 Ala. 110, 26 So. 2d 849↩ (1946), which involved litigation over the state's liability on certain bonds, it appears that the University Hospital had formerly been the Jefferson County (Birmingham) Hospital, and was acquired by the board of trustees by purchase in 1944.
2. Our findings above relative to the duties and responsibilities of OB-GYN residents are largely based upon Joint Exhibit 4-D, attached to the Stipulation of Facts and incorporated herein by reference. Paragraph 7 of the stipulation states that Exhibit 4-D is a "Description of Residency, First Year Resident - Obstetrics, First Year Resident - Gynecology, Second Year Resident - Obstetrics, Second Year Resident - Gynecology." Copies were distributed to each such resident at the beginning of his residency.↩
3. It would appear that, under section 117(b) (2)(B)↩, petitioner could have claimed $3,600 (12 months at $300 per month), rather than the $2,400 actually claimed on the 1968 return.